MIDDLE DISTRICT *of* ALABAMA

**FEDERAL DEFENDER**
PROGRAM, INC.

*Protecting Rights • Pursuing Justice*

CECILIA VACA
FEDERAL DEFENDER

July 21, 2026

David J. Smith, Clerk of Court
United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

>   **Re:** *United States v. Slaybaugh*, No. 25-14394

Dear Mr. Smith:

Pursuant to Fed. R. App. P. 28(j), Mr. Slaybaugh submits this letter, advising this Court that the Supreme Court's recent decision in *Chatrie v. United States*, 609 U.S. ___ (2026), constitutes pertinent and significant supplemental authority in this case.

*Chatrie* held that the government's acquisition of Google location history constitutes a Fourth Amendment search because "an individual has a reasonable expectation of privacy in records about his cell phone's location, and police intrude on that constitutionally protected interest when they demand the information—even though for only a limited time, and from a third-party tech company." *Chatrie*, 2026 WL 1855568 at *4.

*Chatrie* supports the argument set forth in Issue I(A) of Mr. Slaybaugh's initial brief, because it reinforces that *Carpenter v. United States,* 585 U.S. 296 (2018)—rather than *United States v. Knotts,* 460 U.S. 276 (1983)— supplies the relevant framework for addressing whether the government's use of newfound tracking technology invaded Mr. Slaybaugh's reasonable expectation of privacy in the whole of his physical movements. *Id.* at *9-12; (Blue Brief at 7-20). *Chatrie* explained that, like the cell site location information in *Carpenter,* Google location history provided a "fine-tuned" picture of a person's movements, and allowed police to reconstruct, retrospectively and effortlessly, someone's comings and goings. *Id.* at *10-11. *Chatrie* emphasized that *Knotts* was limited to the rudimentary beeper at issue in that case, and did not apply to sophisticated forms of government surveillance. *Id.* at *13.

Additionally, *Chatrie* rejected the government's argument that no Fourth Amendment search had occurred because of the limited, two-hour duration of the location history requested by law enforcement. *Id.* at \*12.  The Court emphasized that it had "never understood Fourth Amendment protections as kicking in only once an intrusion 'goes too far,'" and setting "durational bounds" on the location data did little to address Fourth Amendment concerns when the officials were able to select the time-limited set of materials they wanted from an all-encompassing database. *Id.* at \*13.  Regardless of durational bounds, aggregated data tracking a person's physical movements may constitute a Fourth Amendment search per *Chatrie* and *Carpenter*.

*/s/Mackenzie S. Lund*
Mackenzie S. Lund, Esq.
TX Bar Code: 24092731
Middle District of Alabama
Federal Defenders Office
817 South Court Street
Montgomery, Alabama 36104
TEL:  (334) 834-2099
FAX:  (334) 834-0353
Mackenzie_S_Lund@fd.org
Counsel for Robert Slaybaugh

(Slip Opinion)                     OCTOBER TERM, 2025                          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHATRIE *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FOURTH CIRCUIT

No. 25–112.   Argued April 27, 2026—Decided June 29, 2026

On May 20, 2019, a man robbed a credit union in Midlothian, Virginia. Local police officers learned from witness interviews and surveillance footage that the robber had approached the credit union from a corner of an adjacent church while appearing to talk on a cell phone, but they could not find out anything more, and the robber remained at large. On June 14, the police officers applied to a Virginia magistrate for a geofence warrant directed to Google, which would require Google to hand over data about the cell phones located within a 150-meter radius of the credit union—the so-called "geofence"—near the time of the crime. The application described the cell-phone location data Google collects through a service called Location History, which records the location of a user's cell phone every two minutes or so. The application also explained how that cell-phone location data could help identify the robber, possible accomplices, or additional witnesses. The warrant described a three-step process that the police would follow: at step one, Google would produce anonymized location data for all cell phones within the geofence 30 minutes before to 30 minutes after the robbery; at step two, officers would attempt to narrow the list, and Google would provide additional anonymized data for that narrowed list, consisting of cell-phone locations both inside and outside the geofence during a two-hour period surrounding the robbery; and at step three, officers would further narrow the list, and Google would turn over identifying information, including names and phone numbers, for users on the final list. The magistrate issued the warrant, and through this process, Google ultimately produced three cell-phone users' identifying information, including petitioner Okello Chatrie, whose location data showed that he entered the geofence about ten minutes before the robbery and headed toward a residential area immediately after leaving

2                    CHATRIE *v.* UNITED STATES

Syllabus

the bank.

Following further police work, a federal grand jury charged Chatrie with robbery and related firearms offenses, and he moved to suppress the information the police obtained from Google. According to Chatrie, the officers had acquired that data through a Fourth Amendment search, and the warrant ostensibly authorizing that search was invalid. The District Court found that the geofence warrant "plainly violates the rights enshrined in [the Fourth] Amendment" but denied the motion based on the good-faith exception to the exclusionary rule. 590 F. Supp. 3d 901, 905, 937–938. A divided panel of the Fourth Circuit affirmed on different reasoning, holding that no search occurred because Chatrie "did not have a reasonable expectation of privacy in two hours' worth of Location History data voluntarily exposed to Google." 107 F. 4th 319, 325. The Fourth Circuit granted rehearing en banc and affirmed in a one-sentence *per curiam*, with the court dividing evenly on whether a Fourth Amendment search had occurred. This Court granted certiorari solely on the question whether the police violated the Fourth Amendment in obtaining Chatrie's location data.

*Held*: Police officers conducted a Fourth Amendment search when they acquired Chatrie's location data from Google because an individual has a reasonable expectation of privacy in his cell-phone location information. Pp. 10–33.

(a) The Fourth Amendment protects individuals' reasonable expectations of privacy, and governmental "intrusion into that private sphere generally qualifies as a search." *Carpenter* v. *United States*, 585 U. S. 296, 304. The Amendment's "basic purpose" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," *id.*, at 303, and it was designed "to place obstacles in the way of a too permeating police surveillance," *United States* v. *Di Re*, 332 U. S. 581, 595. Pp. 10–29.

(1) In *Carpenter*, this Court held that accessing cell-site location information (CSLI) constitutes a Fourth Amendment search because "individuals have a reasonable expectation of privacy in the whole of their physical movements," 585 U. S., at 310. The Court reasoned that CSLI provides a "detailed" and "encyclopedic" portrait of a person's whereabouts, *id.*, at 309, and, with that, "an intimate window into a person's life," *id.*, at 311. Because people "compulsively carry" their cell phones "all the time," the Court explained, a cell phone "tracks nearly exactly the movements of its owner," and thus "faithfully follows" him not only through "public thoroughfares [but] into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Ibid.* The Court further observed that the "newfound tracking capacity" that CSLI gives the police "runs against everyone"—not just those "under investigation"—and "travel[s] back

Cite as: 609 U. S. \_\_\_ (2026)       3

Syllabus

in time," making possible a form of surveillance that would have been unknown prior to the digital age, *id.*, at 311–312. *Carpenter* accordingly held that "[a]llowing government access to cell-site records contravenes" expectations of privacy. *Id.*, at 311. Pp. 13–15.

(2) Everything *Carpenter* relied on to find that law enforcement officers conducted a Fourth Amendment search when they accessed CSLI records applies as well or better to the police's accessing of Location History data. First, Location History provides an even more fine-tuned picture of a person's movements, pinpointing location within around twenty meters rather than within sectors of one-eighth to four square miles; it records location every two minutes or so for a daily average of 720 chartings rather than 101; and it can estimate elevation to reveal which floor of a building a phone is on. Second, Location History allows police to reconstruct "retrospective[ly]," and with no real effort, people's comings and goings in any area, enabling "tireless and absolute surveillance" of any number of people in any number of places. *Carpenter*, 585 U. S., at 312. And third, Location History implicates personal privacy interests even more than CSLI, because Location History is more the cell-phone user's own. Most cell-phone users have no awareness of CSLI records, and would never try to retrieve them; by contrast, Google users regularly employ Location History as a personal journal. In that way, Location History resembles other private materials—*e.g.*, emails, documents, photographs, or calendars—that even if stored on Google's servers, a user reasonably views as his own and expects to be shielded from the "inquisitive eyes" of the government. *Id.*, at 305. Pp. 16–18.

(3) The Government's argument that accessing only a short amount of cell-phone location information does not count as a Fourth Amendment search fails. "[E]ven short-term monitoring" can provide "a wealth of detail about [a person's] familial, political, professional, religious, and sexual associations," *United States* v. *Jones*, 565 U. S. 400, 415, and this Court has never understood Fourth Amendment protections as kicking in only once an intrusion "goes too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415. Where the Fourth Amendment applies, it applies regardless of "the quality or quantity of information" the government obtains. *Kyllo* v. *United States*, 533 U. S. 27, 37. That approach makes all the more sense when, as with Location History, law enforcement officials can select the time-limited set of materials they want from an all-encompassing database. Pp. 18–23.

(4) The Government argues that the so-called third-party doctrine precludes Chatrie from invoking the Fourth Amendment's protections. The idea is that in "authoriz[ing] Google to collect, retain, and use" his location information, Chatrie lost his legitimate expectation of privacy, and therefore his right to complain of a search. Brief for United States

4                    CHATRIE *v.* UNITED STATES

Syllabus

15. But *Carpenter* refused to apply the third-party doctrine to CSLI, and no good reason exists to reach a different result for Location History. In *Carpenter*, the Court rejected application of the third-party doctrine to CSLI because such information is "qualitatively different" from "telephone numbers and bank records," 585 U. S., at 309—it is incomparably "revealing" and is "not truly 'shared' as one normally understands the term" given that cell phones are "indispensable to participation in modern society," *id.,* at 315. Both differentiating features apply equally or better to Location History, which is even more "revealing" than CSLI and is "not truly shared" in the normal sense of wanting a third party to see or use it. *Id.*, at 315. The exposure of that information to Google is merely what happens when a user avails himself of one of the services on his cell phone. The Government's argument that generating Location History, unlike producing CSLI, is a voluntary choice is meritless. That argument ignores how and why Google users turn on Location History: Google repeatedly prompts users to turn on the service, often warning that devices will not "work correctly" otherwise, 2 App. 140–141, while not disclosing in that prompt how frequently users' location information would be recorded, how precise it would be, or how it might be given to the government. More generally, an app-by-app, feature-by-feature method of granting Fourth Amendment protection misapprehends the nature of modern cell-phone use, where nearly everything requires some kind of "affirmative act" beyond "powering up" a given app or service. The Government wishes to disconnect the activities people do on their cell phones from the mere act of carrying a turned-on cell phone (the thing that generates CSLI), with only the latter receiving assured Fourth Amendment protection. But the point of carrying smartphones is to use what is on them—as *Carpenter* said, to use the apps and "services they provide." 585 U. S., at 315. Accordingly, a cell-phone user is not to be viewed as sharing private information with third parties—which then can be freely passed on to the government—just by doing the ordinary things cell-phone users do. Pp. 24–29.

(b) The conclusion that a Fourth Amendment search occurred does not resolve this case, because the Fourth Amendment prohibits only searches that are "unreasonable." When law enforcement officials undertake a search to discover evidence of a crime, the reasonableness standard generally requires that they seek a warrant from "a neutral and detached magistrate," *Johnson* v. *United States*, 333 U. S. 10, 14, who may issue a warrant only when "probable cause is properly established and the scope of the authorized search is set out with particularity," *Kentucky* v. *King*, 563 U. S. 452, 459. The warrant issued here, as described earlier, was an uncommon, multi-step one, and the parties have contested the legality of each stage of the search process it

Cite as: 609 U. S. ___ (2026)          5

Syllabus

authorized.  The Fourth Circuit did not address the questions that unusual warrant raises.  Because this is "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7, the Court leaves it up to the Court of Appeals to decide whether, at each step of the search process, the warrant satisfied the Fourth Amendment's requirements of particularity and probable cause.  Pp. 29–32.

136 F. 4th 100, vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAVANAUGH, and JACKSON, JJ., joined.  JACKSON, J., filed a concurring opinion, in which SOTOMAYOR, J., joined.  GORSUCH, J., filed an opinion concurring in the judgment.  ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined as to Part I, and in which BARRETT, J., joined as to Parts II–B, II–C–1, and II–C–2.  BARRETT, J., filed a dissenting opinion.

Cite as: 609 U. S. ____ (2026)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

---

No. 25–112

---

## OKELLO T. CHATRIE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2026]

JUSTICE KAGAN delivered the opinion of the Court.

In recent years, law enforcement officers have employed so-called geofence warrants to obtain information that technology companies collect about their users' cell-phone locations. Suppose that investigators know a crime was committed at a particular place and time, but do not have a suspect. They may draw a "geofence"—a virtual perimeter—around the crime scene and get a warrant compelling a company to hand over data about the cell phones located in that area near the time of the crime. Following a process specified in the warrant, the company will turn over the cell-phone data and eventually identify by name one or more of the users thus disclosed.

The geofence warrant at issue here was directed to Google, and used to solve a bank robbery. Hundreds of millions of Google users have activated a service called Location History, which records the location of a user's cell phone every two minutes or so. Through a geofence warrant, police officers required Google to turn over Location History data revealing cell phones within the vicinity of a bank at around the time it was robbed. At the end of the multi-step process described in the warrant, Google gave

2                    CHATRIE *v.* UNITED STATES

Opinion of the Court

the police three names.  The Federal Government soon charged one of the individuals thus identified, petitioner Okello Chatrie, with committing the crime.

Today, we consider how the Fourth Amendment applies to that use of a geofence warrant.  Answering that question in full would mean deciding whether the police conducted a Fourth Amendment "search" when they acquired the cell-phone data leading to Chatrie's arrest and, if so, whether that search was reasonable given the features of the warrant they employed.  We decide the first part of that inquiry today, concluding that the police conducted a search when they gained access to Location History data.  An individual has a reasonable expectation of privacy in records about his cell phone's location, and police intrude on that constitutionally protected interest when they demand the information—even though for only a limited time, and from a third-party tech company.  We leave to the Court of Appeals the further question whether, given the warrant issued, the search here was reasonable, meaning that each of its steps was properly described with particularity and found to be supported by probable cause.

I

A

Modern cell phones, we observed a dozen years ago, are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley* v. *California*, 573 U. S. 373, 385 (2014).  Since then, the percentage of Americans who own smartphones has only increased.  Today, more than nine in ten Americans own a smartphone.  See W. Bishop, Pew Research Center, Mobile Fact Sheet (Nov. 20, 2025) (91%); compare A. Smith, Pew Research Center, Smartphone Ownership—2013 Update (June 5, 2013) (56%).  That means they are likely addicted to apps and other services, many of which collect and store

Cite as: 609 U. S. ____ (2026)          3

Opinion of the Court

"detailed information about all aspects of a person's life." *Riley*, 573 U. S., at 396.

Among that information is a single fact most pertinent here: where the user's cell phone is located at a given time. Apps of many kinds rely on that datum. Your maps app wants to help you navigate from Point A (where you are) to Point B (where you are going). Ride-sharing apps of course track your location when you are using them, and often do so even when you are not. Weather apps want to tell you about local conditions. Fast-food apps want to identify the closest burger and pizza joints. Fitness apps want to track your running routes. And so on.

This case concerns a form of cell-phone location data called "Location History," which Google apps collect and store.[1] Location History is what it sounds like—a time-stamped record of every place a cell phone has been. Every two minutes or so, Location History draws from an array of sources to log a cell phone's location. Those sources include nearby Wi-Fi networks, Bluetooth beacons, and cell sites, as well as GPS and IP address information. When combined, the signals tracked can determine a cell phone's location within 20 meters. They can also ascertain a phone's elevation, and thus reveal which floor within a building the phone is on. By all accounts, those features make Location History "the most sweeping, granular, and comprehensive tool" existing today for collecting and storing location data. 590 F. Supp. 3d 901, 907 (ED Va. 2022).

Google repeatedly prompts users to enable Location History, and over 500 million users worldwide have done so. The first prompt comes when a user initially establishes a Google account. If that spur is ignored, another will arrive when a user sets up a Google app—like Google Assistant,

―――――――――

[1] Throughout this opinion, we describe how Location History worked at the time the warrant at issue was executed. As noted below, Google has since then instituted a significant change, which apparently insulates Location History data from geofence warrants. See *infra*, at 4, n. 2.

4                CHATRIE *v.* UNITED STATES

Opinion of the Court

Google Maps, or Google Photos—on his phone or other de-
vice.  Android (though not iPhone) users are specifically
warned that their devices will not "work correctly" unless
they turn on Location History.  2 App. 140–141.  And once
a user does so, the service runs—and runs constantly—in
the background.  Regardless whether the user has a Google
app open—or whether he is using his phone at all—Loca-
tion History remains active.  Indeed, it continues to work
even if the user deletes the app through which he first
turned it on.  Location History stops only if a user affirma-
tively stops it.  Sans that intervention, it tracks and tracks
and tracks a user's cell phone (and other devices).

   Google stores all Location History data in the cloud, ra-
ther than on a user's device—though that choice makes no
real difference to the user.  "Cloud computing" refers to "the
capacity of Internet-connected devices to display data
stored on remote servers rather than on the device itself."
*Riley*, 573 U. S., at 397.  Because it exists, Google can store
information on its own servers, while the user can view it
as if stored on his cell phone.  Such remote storage, we have
explained, is common: "Cell phone users often may not
know whether particular information is stored on the device
or in the cloud, and it generally makes little difference."
*Ibid.*  So, for example, Google usually stores users' emails,
documents, and photographs on company servers instead of
on individual devices.  See Brief for Google LLC as *Amicus
Curiae* 3, 37–38.  And the same is true of the information
generated by Location History, which is stored in a single
central repository on Google's servers.[2]  That data exists
someplace remote, but a user sees it—and the content

_____

   [2] Except that in July 2025, years after the geofence warrant used in
this case, Google made a change: It now stores Location History data on
individual users' devices rather than on its own servers.  See Brief for
Google LLC as *Amicus Curiae* 2.  Google represents that, as a result, it
is no longer capable of responding to geofence warrants that seek Loca-
tion History data.  See *ibid.*

Google creates from it—in the palm of his hand.  The user thus can access a "Timeline" showing where he has traveled when; receive real-time updates about his daily commute; and take advantage of maps and recommendations based on his usual movements.

## B

In the last decade, Google's Location History data has also served another function, though this one unknown to most users: That data, as obtained through a geofence warrant, can enable law enforcement officers to solve hard-to-solve crimes.  Such a warrant, as earlier described, seeks information about the cell phones located in the vicinity of a crime scene at around the time the crime was committed.  See *supra*, at 1.  The goal, put simply, is to find out who was there and so who might have done it.  (There are usually better ways to investigate an already-known suspect—like seeking only his location data.)  And the mechanism is to use the offender's cell phone as an identifying device.  The warrant specifies a timeframe and maps an area (with the geofence as its perimeter), and demands information about the cell phones—and their users—present within it.  There is some uncertainty about how often the technique in fact works.  See Brief for Orin S. Kerr as *Amicus Curiae* 14 (Kerr Brief).  But its use among law enforcement officers has flourished.  Google received its first geofence warrant in 2016.  See 590 F. Supp. 3d, at 914.  Two years later, it received 982; and two years after that, more than 11,000.  See Google, Supplemental Information on Geofence Warrants in The United States (Aug. 2021), https://services.google.com/fh/files/misc/supplemental_information_geofence_warrants_united_states.pdf (archived at https://perma.cc/LN4P-KQJA).  Though the details vary, each has made the

6                    CHATRIE *v.* UNITED STATES

Opinion of the Court

same essential demand: Tell us, through cell-phone location data, who was there when a crime happened.[3]

As those demands began to proliferate, Google worked with law enforcement officials to develop a three-step protocol to govern geofence warrants. At the first step, Google produces anonymized (*i.e.*, no names attached) location data for all cell phones (or other devices) within the geofence—typically, a circle with a designated radius surrounding a latitude/longitude coordinate—during a specified timeframe. That data generally includes each phone's latitude/longitude coordinate and corresponding timestamp; an estimate of that information's accuracy; and a description of the information's source (*e.g.*, a Wi-Fi network, a cell site, or some other). The data at this stage shows each user's location, every two minutes or so, within the geofence. At the second step of the process, officials review the data produced and typically ask Google to provide additional information for a subset of still-anonymized users. That new data is usually for a longer timeframe than first specified; it also shows the user's location outside, as well as inside, the geofence. Finally, at the third step, officials demand the identities of a further subset of users—their names, email addresses, and phone numbers. Thus, the geofence warrant is designed to eventually produce a select number of identified users suspected of committing the crime under investigation.

### C

On May 20, 2019, at about 4:50 p.m., a man robbed a credit union in Midlothian, Virginia. The robber presented a teller with a handwritten note demanding $100,000,

---

[3] Google is not the only tech company that has received geofence warrants; so have Apple, Lyft, Snapchat, and Uber, among others. See 136 F. 4th 100, 102, n. 1 (CA4 2025) (en banc) (Diaz, C. J., concurring). But Google is the "most common recipient and the only one known to respond." *Ibid.*

threatening to hurt her and her family if she did not comply, and warning her that he had "boys on the lookout out side." 590 F. Supp. 3d, at 905–906. When the teller replied that she did not have access to that amount of money, the robber brandished a firearm. He ordered everyone in the bank to the ground, and forced the bank's manager to open a safe and put $195,000 into a bag. The robber then left on foot with the money.

Local police officers responded to the scene and began an investigation. They learned, from witness interviews and surveillance-camera footage, that the robber had approached the credit union from a corner of an adjacent church, while appearing to talk on a cell phone. But they could not find out anything more, and the robber remained at large.

On June 14, the police officers thus applied to a Virginia magistrate for a geofence warrant directed to Google. The application described the cell-phone location data Google collects, and explained how that data could lead to identifying the robber, his possible accomplices, or additional witnesses to the crime. Success was particularly likely here, the application stated, because the robber appeared to be using his phone when he entered the credit union, and may even have been speaking with an accomplice. The officers' proposed geofence was a circle with a radius of 150 meters surrounding the credit union.

The warrant application went on to describe the three-step process that the police would follow to obtain the location information sought. At step one, Google would produce anonymized location data for all cell phones within the geofence in the hour between 4:20 and 5:20 p.m. (30 minutes before to 30 minutes after the robbery). At step two, police officers would "attempt to narrow down the list [of devices] by reviewing the time stamped location coordinates for each [device] and comparing that against the known time and location information that is specific to this

8          CHATRIE *v.* UNITED STATES

Opinion of the Court

crime." 2 App. 136. For that narrowed list, Google would provide additional (but still anonymized) data—cell-phone locations both inside and outside the geofence during a two-hour period (so now from 3:50 to 5:50 p.m.). Finally, at step three, police would again "attempt to narrow down the list by comparing this additional information regarding travel and time against the known time and location information that is specific to this crime." *Id.*, at 137. And Google would then turn over identifying information for each user on the final list, including his name and phone number.

The magistrate issued the warrant, and officers executed it in the manner prescribed. At the first stage of the process, Google gave up anonymized data for 19 users found within the geofence during the hour within which the robbery occurred. At the second stage, the officers winnowed the list to nine users. And Google produced anonymized data showing their movements both inside and outside the geofence for the extended two-hour period. At the third and last step, the police again narrowed the list, this time to three users. Google responded with their identifying information. One of the three was Chatrie. The location data showed that he entered the geofenced area about ten minutes before the robbery, and headed toward a residential area of town immediately after leaving the bank.

Following further police work, a federal grand jury charged Chatrie with robbery and related firearms offenses. He moved to suppress the information that the police had obtained from Google. According to Chatrie, the officers had acquired that data through a Fourth Amendment search, and the warrant ostensibly authorizing that search was invalid.

The District Court mainly agreed with Chatrie's Fourth Amendment analysis, but still denied the motion to exclude the Location History evidence. Even though "this particular geofence warrant plainly violates the rights enshrined in [the Fourth] Amendment," the court stated, the officers'

Opinion of the Court

reliance on it was not "objectively unreasonable." 590 F. Supp. 3d, at 905, 938. And because that was so, the court concluded, the good-faith exception to the exclusionary rule permitted admission of the location data. See *id.*, at 937–938; *United States* v. *Leon*, 468 U. S. 897, 922–923 (1984) (establishing good-faith exception).

A divided panel of the Court of Appeals of the Fourth Circuit affirmed, but on different reasoning. The majority held that the government did not conduct a search and therefore did not need a warrant. That was so, the majority reasoned, because Chatrie "did not have a reasonable expectation of privacy in two hours' worth of Location History data voluntarily exposed to Google." 107 F. 4th 319, 325 (2024). Judge Wynn dissented, arguing that "the police intrusion into Chatrie's Location History data" was "a search that triggered the Fourth Amendment's protections," and that the warrant issued was "so lacking in particularity and probable cause that it was invalid." *Id.*, at 339, 362, and n. 12.

After granting rehearing en banc, the Fourth Circuit affirmed in a one-sentence *per curiam*. See 136 F. 4th 100, 101 (2025) ("The judgment of the district court is *AFFIRMED*"). In multiple accompanying writings, the court divided evenly (7 to 7) on whether a Fourth Amendment search had occurred. Of the seven judges who thought it had, most believed the geofence warrant defective. But most also thought the exclusionary rule's good-faith exception applied, so ruled against Chatrie anyway.

We granted certiorari solely on the question whether the police violated the Fourth Amendment in obtaining Chatrie's location data, thus declining to consider the exclusionary rule issue. See 607 U. S. 1148 (2026). The disputed Fourth Amendment question divides into two parts. First, did law enforcement officials conduct a search under the Fourth Amendment when they acquired Chatrie's location data from Google? We hold that they did because an individual has a legitimate expectation of privacy in his cell-

phone location data.  Second, did the multi-step geofence warrant issued here make that search reasonable?  We leave that question—which requires deciding whether the warrant satisfied the Fourth Amendment's probable cause and particularity requirements at each stage of the search process—to the Court of Appeals to address in the first instance.[4]

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The "basic purpose" of that Amendment, our precedents say, is "to

_____

[4] In line with our grant of certiorari, we do not address whether the good-faith exception to the exclusionary rule still allows the admission of the Location History data in this case.  That question remains for the Fourth Circuit to consider anew, gleaning anything it thinks relevant from our decision on the substantive Fourth Amendment issues.

The principal dissent seeks to rehash our limited grant of certiorari, but we see no reason to doubt it.  We have Article III jurisdiction in this case, as even the dissent concedes.  See *post*, at 4, n. 2 (ALITO, J.).  That is because the Fourth Circuit is free to revisit the exclusionary rule issue in light of our opinion and to provide Chatrie with relief.  See *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (Article III jurisdiction disappears only when it becomes "impossible for the court to grant any effectual relief whatever to the prevailing party").  So what does the dissent mean when it continually labels this opinion "advisory" (*post*, at 1, 2, 4, 5, 6, 7)—a term customarily used to describe opinions lacking a jurisdictional basis?  Apparently, the dissent's objection is that we today decide a question involving the Fourth Amendment when the odds are strong (so says the dissent) that the Fourth Circuit will eventually, as it did before, resolve this case on exclusionary rule grounds.  But to repeat, the Fourth Circuit may now consider anew, after review of our opinion, how the good-faith exception applies here.  And the very decision establishing that exception held that courts should feel free to "resolv[e] the Fourth Amendment issue" before the good-faith issue, either to better assess good faith or "to guide future action by law enforcement officers and magistrates." *United States* v. *Leon*, 468 U. S. 897, 925 (1984).  So contra the dissent, there is nothing advisory (or otherwise improper) in today deciding the Fourth Amendment issue on which we previously granted certiorari.

Cite as: 609 U. S. ____ (2026)          11

Opinion of the Court

safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter* v. *United States*, 585 U. S. 296, 303 (2018) (quoting *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 528 (1967)).

That purpose is central to decisions about whether a Fourth Amendment "search" has occurred. Our early search doctrine focused on whether law enforcement officials "obtain[ed] information by physically intruding"—that is, trespassing—on private property. *United States* v. *Jones*, 565 U. S. 400, 406–407, n. 3 (2012); see *id.*, at 404–405. But the Court in *Katz* v. *United States*, 389 U. S. 347, 351 (1967), recognized that "the Fourth Amendment protects people, not places." And so we have long held that "property rights are not the sole measure" of a constitutional violation; the Fourth Amendment "protect[s] certain expectations of privacy as well." *Soldal* v. *Cook County*, 506 U. S. 56, 64 (1992); *Carpenter*, 585 U. S., at 304. "When an individual seeks to preserve something as private and his expectation of privacy is one that society is prepared to recognize as reasonable," then governmental "intrusion into that private sphere generally qualifies as a search." *Ibid.*[5]

_____

[5] The dissent suggests that this Court has tried to curtail *Katz* ever since deciding it, see *post*, at 10–11 (ALITO, J.); more energetically, the concurrence advocates overthrowing *Katz* and reverting to a solely property-based approach, see *post*, at 1–2, 4 (GORSUCH, J., concurring in judgment). But this Court has faithfully applied *Katz* for some 60 years. Our decision in *Carpenter* v. *United States*, 585 U. S. 296 (2018), responded to the same arguments made today (see, *e.g.*, *id.*, at 391–397 (GORSUCH, J., dissenting)) by reaffirming that *Katz* had "discredited the premise that property interests control" and that "privacy interests do not rise or fall with property rights." 585 U. S., at 304, n. 1. And in saying as much, *Carpenter* had plenty of other decisions to cite. See, *e.g.*, *United States* v. *Jones*, 565 U. S. 400, 411 (2012) (refusing to "make trespass the exclusive test"); *Kyllo* v. *United States*, 533 U. S. 27, 32 (2001) (stating that the Court has "decoupled violation[s] of a person's Fourth Amendment rights from trespassory violation of his property"). Of course, sometimes the privacy and property approaches will "align," and an opinion

12                CHATRIE *v.* UNITED STATES

Opinion of the Court

Whether an expectation of privacy counts as legitimate is less the result of any fixed set of rules than of "guideposts" stretching back to the Fourth Amendment's beginnings. *Id.*, at 305. From the founding onward, we have explained, the Fourth Amendment has sought to secure the "privacies of life" against the exercise of "arbitrary power." *Boyd* v. *United States*, 116 U. S. 616, 630 (1886); see *Carpenter*, 585 U. S., at 305. So too we have recognized, and repeatedly, that the Amendment was designed "to place obstacles in the way of a too permeating police surveillance." *United States* v. *Di Re*, 332 U. S. 581, 595 (1948); *Carpenter*, 585 U. S., at 305. Whatever the form of an attempted incursion, the Fourth Amendment protects Americans' long-held conviction that no government official should have free access to the most closely kept aspects of their lives.

In recent decades, this Court has often confronted the challenge of adhering to those principles in the face of new technologies. "[I]nnovations in surveillance tools" have "enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Ibid.* The Court, in response, has sought to "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo* v. *United States*, 533 U. S. 27, 34 (2001). So in one decision, we rejected a "mechanical interpretation" of the Fourth Amendment to hold that the use of a thermal imager to detect heat coming

––––––––––

adopting the one will resemble, in whole or part, an opinion adopting the other. *Florida* v. *Jardines*, 569 U. S. 1, 13 (2013) (KAGAN, J., concurring). That is not because the privacy-based approach is groping toward the more "coheren[t]" property-based one, as the concurrence suggests. *Post*, at 8 (GORSUCH, J.). It is simply because property law "naturally enough influence[s]" our "shared societal expectations" of what places and things count as private and should be free from governmental intrusion. *Georgia* v. *Randolph*, 547 U. S. 103, 111 (2006); see *Carpenter*, 585 U. S., at 304, n. 1 ("[P]roperty rights are often informative" in "determining which expectations of privacy are legitimate"). And when such an alignment of the two approaches occurs, then all the better.

Opinion of the Court

from a person's home was a search in the constitutional sense.  *Id.*, at 35.  And in another, we held that the search of a cell phone incident to arrest could not proceed without a warrant (even though the search of a handbag could) because of the phone's "vast quantities of personal information."  *Riley*, 573 U. S., at 386.  Most recently, in *Carpenter* v. *United States*, this Court held that accessing a form of cell-phone location information other than Location History is a Fourth Amendment search given individuals' reasonable expectations of privacy.  See 585 U. S., at 310–313.

We begin with *Carpenter* in considering the Government's front-line position here: that no warrant was needed to get Location History data from Google (although the police "prophylactically secured" one) because no Fourth Amendment search ever took place.  See Brief for United States 14.  We then explain why the result we reached in *Carpenter* once again follows.  Contrary to the Government's view, an individual has a legitimate expectation of privacy in the information Location History collects about his cell phone's—meaning his own—movements.  The police invade that expectation, and thus conduct a search, when they acquire that information, even though for only a limited period of time and even though via a third-party tech company.

### A

The question presented in *Carpenter* was "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements."  585 U. S., at 300.  The cell-phone records at issue were what is known as cell-site location information (CSLI).  As we explained, CSLI is a "time-stamped record" generated each time a cell phone connects to a cell site.  *Id.*, at 301. Wireless carriers collect and store that information for their own business purposes (such as finding weak spots in

14                    CHATRIE *v.* UNITED STATES

Opinion of the Court

their networks).  But CSLI can also benefit law enforce-
ment, because it identifies an individual's approximate lo-
cation every time his phone makes a connection.  In *Car-
penter*, police officers investigating a string of Radio Shack
robberies ordered a wireless carrier of a known suspect to
turn over his CSLI records for a seven-day period (without
first getting a warrant).  Those records showed, as the Gov-
ernment later put it, that the suspect, Timothy Carpenter,
was "right where the . . . robbery was at the exact time of
the robbery."  *Id.*, at 303.  Carpenter moved to exclude the
CSLI records, arguing that the Government acquired them
through an unconstitutional search.

The Court began its analysis by reviewing what it had
said about a different way of tracking "physical location and
movements": the use of a GPS device to monitor a vehicle.
*Id.*, at 306.  In *United States* v. *Jones*, 565 U. S. 400, five
Justices had agreed that such tracking counts as a Fourth
Amendment search because "individuals have a reasonable
expectation of privacy in the whole of their physical move-
ments."  *Carpenter*, 585 U. S., at 310; see *Jones*, 565 U. S.,
at 430 (ALITO, J., concurring in judgment); *id.*, at 415
(SOTOMAYOR, J., concurring).[6]  That made sense, the *Car-
penter* Court thought, even though the movements occurred
in public.  Prior to the digital age, pursuing a suspect "for
any extended period of time was difficult and costly and
therefore rarely undertaken."  585 U. S., at 310 (quoting
*Jones*, 565 U. S., at 429 (opinion of ALITO, J.)).  As a result,
"society's expectation has been that law enforcement agents
and others would not—and indeed, in the main, simply
could not—secretly monitor and catalogue every single
movement of an individual's car."  *Carpenter*, 585 U. S., at
310 (quoting *Jones*, 565 U. S., at 430 (opinion of ALITO, J.)).

_____

[6]An overlapping set of five Justices decided the case on a different
ground, based on the Government's physical trespass of the vehicle.  See
*Jones*, 565 U. S., at 404–405.

Opinion of the Court

A new technology should not transform what individuals had reasonably thought they could withhold from the Government.

It followed *a fortiori*, *Carpenter* held, that "[a]llowing government access to cell-site records contravenes" expectations of privacy. 585 U. S., at 311. To an even greater degree than GPS monitoring, CSLI can provide a full "record of the holder's whereabouts" and, with that, "an intimate window into a person's life." *Ibid.* People, after all, "regularly leave their vehicles," but they "compulsively carry" their cell phones "all the time." *Ibid.* A cell phone thus "tracks nearly exactly the movements of its owner": It "faithfully follows" him not only through "public thoroughfares [but] into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Ibid.* What is more, the "newfound tracking capacity" that CSLI gives the police "runs against everyone"—not just those "under investigation"—and "travel[s] back in time." *Id.*, at 312. Police officers need not decide in advance (as they do with GPS devices) who they want to follow and when. Instead, they can easily and cheaply—with "just the click of a button"—reconstruct any person's movements "retrospective[ly]." *Id.*, at 311–312. What in the past was "unknowable" suddenly becomes open to view, presenting formerly unimaginable "privacy concerns." *Ibid.* The Court thus concluded: "[W]hen the Government accessed CSLI from the wireless carriers"—thereby obtaining a "detailed log" of where Carpenter had gone for seven days—"it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.*, at 312–313.[7]

---

[7]A significant fraction of the dissent is devoted to relitigating *Carpenter*, from which its author dissented. See *post*, at 1, 8–10, 13–14, 19–21 (ALITO, J.). *Carpenter*, the dissent complains today, "extended the Fourth Amendment's warrant requirement to encompass a category of government investigations that it had never previously covered": The decision "thus reflected a stark departure from both traditional Fourth

16                CHATRIE *v.* UNITED STATES

Opinion of the Court

B

The resemblances between CSLI and Location History, in their relationship to personal privacy, practically leap off the page. Everything *Carpenter* relied on to find that law enforcement officers conducted a Fourth Amendment search when they accessed wireless carriers' CSLI records applies as well or better to the police's accessing of Google's Location History data.

First, Location History provides an even more fine-tuned picture of a person's movements than CSLI. *Carpenter* noted that through CSLI records, police could "achieve[] near perfect surveillance" of an individual holding a cell phone. *Id.*, at 311–312. But Location History is nearer perfect still. Here is one way of comparing the two: At any given time, CSLI placed Carpenter within a "sector ranging from one-eighth to four square miles," whereas Location History pinpointed Chatrie's location within around twenty meters, which is less than two percent of a mile. *Id.*, at 312; see 1 App. 45, 3 *id.*, at 173–174. Or here is another

_____

Amendment principles and this Court's 20th-century doctrine." *Post*, at 13. In leveling that charge, the dissent re-ups arguments, point-for-point, that *Carpenter* specifically rejected. Compare *post*, at 8, 13 (maintaining that compelled document-production orders are never searches), with 585 U. S., at 317–318 (rejecting that view); compare also *post*, at 9, 13 (contending that the Fourth Amendment never protects documents held by third parties), with 585 U. S., at 313–316 (likewise rejecting that view). In light of that outlook, it is perhaps not so surprising that the dissent criticizes today's decision as "rely[ing] primarily" on *Carpenter*, rather than on earlier Fourth Amendment decisions. *Post*, at 13. But on that supposed offense, we plead guilty as charged. *Carpenter* is the most recent decision of this Court to consider the Fourth Amendment's application to new surveillance technologies—indeed, to law enforcement's use of those technologies to create a "chronicle of [a cell-phone] user's past movements." 585 U. S., at 300. What would be grounds for complaint is if this decision did *not* "rely primarily" on *Carpenter*. *Post*, at 13. And as the next section of this opinion shows, the more one delves into the technologies at issue, the closer the parallels become. See *infra* this page and 17–18.

Opinion of the Court

measure: CSLI logged Carpenter's location an average of 101 times a day, whereas Location History commonly records a person's location every two minutes, for a daily average of 720 chartings. See *Carpenter*, 585 U. S., at 302; 136 F. 4th, at 151 (Berner, J., concurring). Or finally, a third: Unlike CSLI, Location History can estimate a phone's elevation—so, for example, can tell whether someone has gone into a doctor's office on the first floor of a multi-story building, or a private apartment on the tenth. Of course, the accuracy of each of the two techniques may vary in different places and at different times. But across the board Location History is the far more precise measure. When the *Carpenter* Court said that CSLI provides a "detailed" and "encyclopedic" portrait of a person's whereabouts, it did not know what further technology was on the horizon. 585 U. S., at 309.

And next, Location History also allows police officers to reconstruct "retrospective[ly]," and with no real effort, people's comings and goings in any area. *Id.*, at 312. As with CSLI, the Government need not decide in advance the kind of surveillance it should undertake, whether of a person or a site. "Whoever the suspect turns out to be," *Carpenter* said of CSLI, "he has effectively been tailed every moment of every day." *Ibid.* Likewise, as this case shows, wherever a location of interest turns out to be (whether a crime scene or a protest march or even a private home), it has effectively been surveilled for the same boundless time. Google's Location History will be available to chart the movements of many individuals—or a few or one—within the vicinity, again at the "click of a button." *Id.*, at 311. Recall that in *Jones*, it was thought notable that law enforcement officials of an earlier age usually could not monitor every movement of an individual's car, as a GPS device does. See *supra*, at 14–15; 565 U. S., at 430 (opinion of ALITO, J.); see also *Carpenter*, 585 U. S., at 312 ("In the past, attempts to reconstruct a person's [prior] movements were limited"). Far less

could those officials ever perform the "tireless and absolute surveillance" of any number of people in any number of places, public and private, that Location History can accomplish. *Ibid.* If the one kind of intrusion clashes with "society's expectation[s]" of what counts as private, so must the other. *Jones*, 565 U. S., at 430 (opinion of ALITO, J.).

Indeed, Location History records implicate those privacy interests still more than CSLI data because the former is more the individual's own. Most cell-phone users have no awareness of CSLI records, and anyway would never try to retrieve them. The records are instead the province of wireless carriers, which maintain them for an array of business functions. See *Carpenter*, 585 U. S., at 301; *supra*, at 13–14. Location History information is different. No doubt, Google itself uses those records to improve the quality of its apps. But Google users, too, regularly employ Location History—for example, "to remind themselves of a restaurant they ate at two weeks ago, the time they were last at a friend's home, the sites they saw on vacation, or the distance they walked on a particular day." Brief for Google LLC as *Amicus Curiae* 8. The records thus serve as a personal journal of a user's movements, which that user consults (and even can edit) for his own purposes. See *id.*, at 10. In that way, Location History resembles other private materials—think of emails, documents, photographs, or calendars—that even if stored on Google's servers, a user reasonably views as his own. And as a result, that he reasonably expects to be shielded from the "inquisitive eyes" of the government. *Carpenter*, 585 U. S., at 305.

## C

The Government, not much contesting any of the above, principally argues on a different ground: that accessing only a short amount of cell-phone location information (whether Location History or CSLI) does not count as a Fourth Amendment search. (The dissent likewise contends

Opinion of the Court

that the "duration" of data obtained here is too brief for a search to have happened. *Post*, at 14 (ALITO, J.); see *post*, at 15–16.) Recall that *Carpenter* involved seven days' worth of location data. See *supra*, at 14–15. And in deciding that case, this Court reserved the issue whether there was a more "limited period for which the Government may obtain" such data "free from Fourth Amendment scrutiny." 585 U. S., at 310, n. 3.[8] The Government now claims that the answer is yes, and that the two hours' worth of Location History acquired here falls within the Constitution-free zone. In the Government's view, a person has no reasonable expectation of privacy in "that short a time window" of location data, because his "short-term" movements will "reveal[] little about the details of [his] personal life." Brief for United States 12, 20; see *id.*, at 20 ("A single stop at a doctor's office, for example, does not in itself identify the reason for the visit"). The Government cites in support *United States* v. *Knotts*, 460 U. S. 276, 282 (1983), in which the Court held that police officers' use of a beeper to assist an hours-long tail of a car did not bring the Fourth Amendment into play. The lesson the Government draws is that law enforcement officials accessing Location History should receive a Fourth Amendment grace period of some number of hours.

―――――――――
[8] In comparing *Carpenter* and this case, the dissent sometimes treats the former as involving not 7 days but instead 127 days of location data. See *post*, at 13, 14, 15 (ALITO, J.). But there is no basis for doing so. To be sure, one of the two wireless carriers involved in the case had turned over 127 days of data, as the Court noted. See 585 U. S., at 302. But the other was ordered to turn over only 7 days, and the Court could not have been clearer that its holding applied whenever the Government accessed a week or more of CSLI data (with everything below that amount reserved). See *id.*, at 310, n. 3 ("It is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search"). The dissent acknowledges that fact (*post*, at 15, n. 4), even as it repeatedly invokes the 127-day figure to make its comparative argument sound stronger.

But to begin, the Government is wrong about the incapacity of short-term location information to reveal private matters. "[R]epeated patterns," in the Government's phrasing, are not all that individuals wish to, and reasonably expect to, keep to themselves. Brief for United States 20. Return here to another of *Jones*'s insights: "[E]ven short-term monitoring" of a person's physical movements can provide "a wealth of detail about [his] familial, political, professional, religious, and sexual associations." 565 U. S., at 415 (opinion of SOTOMAYOR, J.). Consider just a few trips that a person is apt to think "indisputably private": to "the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, [or] the by-the-hour motel." *Ibid.* And unlike a GPS device, Location History enables police officers to focus on precisely those sites—to see, in a given time block, who shows up. Similarly, Location History—even two hours of it—allows officers to target one-off events of potential interest: a gun show, say, or a political rally.

Still more fundamentally, we have never understood Fourth Amendment protections as kicking in only once an intrusion "goes too far." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922) (adopting that approach for regulatory takings). Where the Fourth Amendment applies, it applies—regardless of "the quality or quantity of information" the government obtains. *Kyllo*, 533 U. S., at 37. So, for example, this Court held that thermal imaging qualified as a search even though it did not, and was not likely to, detect "private activities" or "intimate details." *Ibid.* The Amendment, we analogized, makes "no exception" for the officer "who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Ibid.* And likewise, the Amendment does not give agents a pass if their wiretap is of limited duration and thus less likely to intrude on private matters. Indeed, in our seminal

Cite as: 609 U. S. ____ (2026)　　　21

Opinion of the Court

wiretap case, the police obtained only 18 minutes of recordings. See *Katz*, 389 U. S., at 354, n. 14.

That approach makes all the more sense when, as with Location History, officials can select the time-limited set of materials they want from an all-encompassing database. Then, the durational bounds on the data actually acquired do little to address the Fourth Amendment's concern about "a too permeating police surveillance." *Di Re*, 332 U. S., at 595; see *supra*, at 12. What creates that concern is that the government can access all of a cell-phone user's movements, in both public and private places—that it possesses a virtual panopticon with which to scrutinize its citizens' activities. The sweep of the official invasion is not made less because the government, with the benefit of hindsight, can pinpoint exactly which few hours of movements it wants to review. That feature of accessing location data is, indeed, more a practical benefit to the government than a limit on its intrusive powers.[9]

And contra the Government, *Knotts* does not support the view that accessing two hours of Location History is not a search. There, police officers put a beeper in a car to help them follow it from Minnesota to Wisconsin. The Court decided that the beeper did not turn the tail into a search, but was explicit in keeping its holding cabined to that rudimentary technology. The defendant had argued that a ruling against him would enable officials to conduct "surveillance

_____

[9] The Government's grace-period approach to Fourth Amendment protection would also create a host of line-drawing questions. At what point, exactly, would a non-search become a search? In two hours, or six hours, or one day, or six days? And how often would the clock reset? If, say, the limit was six hours, could an officer request location data from 6 a.m. to noon, and then again from 12:30 to 6:30 p.m.? And if there were concurrent federal and state investigations of a crime, as there could have been here, would law enforcement access to Location History data double? The approach the Government offers would "keep defendants and judges guessing for years to come." *Riley* v. *California*, 573 U. S. 373, 401 (2014).

22   CHATRIE *v.* UNITED STATES

Opinion of the Court

of any citizen of this country" free from the strictures of the Fourth Amendment.  460 U. S., at 283.  The Court took the concern seriously, stating that if technology progressed so as to allow more sophisticated surveillance, "different constitutional principles" could well apply.  *Id.*, at 284.  And three decades later, five Justices in two opinions found that they did.  When faced in *Jones* with a GPS device—which unlike the beeper allowed remote monitoring—they decided, notwithstanding *Knotts*, that privacy was implicated and a search had occurred.  See *supra*, at 14–15.  Yet even that was not all.  When six years further on, the *Carpenter* Court held that accessing CSLI was a search, it recounted the *Knotts*-to-*Jones* progression to explain why *Knotts* did not stand in its way.  See 585 U. S., at 306–307 (*Knotts* "was careful to distinguish between the rudimentary tracking facilitated by the beeper and more sweeping modes of surveillance").  For the third time, we reach the same conclusion today.

And still another feature of *Knotts* makes it inapt here: that the surveillance there was confined to public roads. That fact was crucial to the Court's decision: "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy," *Knotts* explained, because the car is always "in plain view."  460 U. S., at 281.  By contrast, the movements that Location History reveals are not limited to public streets.  Recall what *Carpenter* observed: A "cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, [and] political headquarters."  585 U. S., at 311; see *supra*, at 15.[10]  In one of those places—a private residence—this

_____

[10] The dissent replies that the "limited geofence procedure" authorized by the warrant here distinguishes this case from *Carpenter* because "the geofence's boundaries" centered on "a public place."  *Post*, at 16 (ALITO, J.).  But as an initial matter, those boundaries were defined by a warrant. If accessing Location History does not count as a Fourth Amendment search, as the dissent generally suggests (see, *e.g.*, *post*, at 12, 17), there

Opinion of the Court

Court has held even beeper technology to count as a search because it could reveal "whether a particular article—or a person, for that matter" was in the home "at a particular time." *United States* v. *Karo*, 468 U. S. 705, 716 (1984). If that is so, accessing Location History must also be a search—even if for only two hours—because that data can far more reliably show someone within a home (indeed, on a specific floor). The Government replies with an odd argument. It thinks that "tracking [someone] into a private residence"—yes, even for two hours—would "probably" be a search, but tells us not to worry because Chatrie did not go home. Tr. of Oral Arg. 98, 134. That approach, however, is foreign to the way the Fourth Amendment works. Whether something is a search does not depend on what it finds. See *Di Re*, 332 U. S., at 595 ("[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts"). An officer, after all, cannot know the fruits of a given surveillance in advance. The surveillance must be either a search or not regardless. The Government's concession thus gives away its argument that, for purposes of the Fourth Amendment, two hours of cell-phone location data is not enough.

—————

will not be a warrant (or any other means) to limit the scope of what law enforcement can demand. And even putting that aside, the dissent's argument is wrong because it ignores how this geofence warrant actually worked. The geofence was not limited to the bank; it also included a nearby church. 590 F. Supp. 3d 901, 918 (ED Va. 2022); cf. Brief for Google LLC as *Amicus Curiae* 12 (noting that, in Google's experience, it is "common for a geofence to cover private homes, apartment buildings, . . . hotels, [and] places of worship"). And regardless, the Location History data the police obtained at the second stage of the search process was not constrained by the geofence. In fact, it showed individuals' trips to private residences, a school, and a hospital. See 590 F. Supp. 3d, at 923–924. So the geofence's boundaries do not somehow turn Location History into a public-movements-only technology or ensure a less "comprehensive" log than in *Carpenter*. *Post*, at 16.

24                CHATRIE *v.* UNITED STATES

Opinion of the Court

### D

The Government has an additional argument, which in *Carpenter* was its "primary" one—that the so-called third-party doctrine precludes Chatrie from invoking the Fourth Amendment's protections. 585 U. S., at 313. (Here too the dissent reiterates the Government's view. See *post*, at 11–12, 17 (ALITO, J.).) The idea is that in "authoriz[ing] Google to collect, retain, and use" his location information, Chatrie lost his legitimate expectation of privacy, and therefore his right to complain of a search—regardless whether it was for two hours, two weeks, or two years. Brief for United States 15. The problem for the Government—and presumably the reason that its primary assertion in *Carpenter* has here become a secondary one—is that *Carpenter* refused to apply the third-party doctrine to CSLI, and no good reason exists to reach a different result for Location History.

The third-party doctrine traces to two cases involving information provided by customers to a bank and telephone company, and then turned over to law enforcement officials. In *United States* v. *Miller*, 425 U. S. 435 (1976), this Court held that a bank depositor had no reasonable expectation of privacy in canceled checks and deposit slips in his bank's possession, because the records were "voluntarily conveyed to the bank[] and exposed to [its] employees in the ordinary course of business." *Id.*, at 442. The depositor, the Court explained, had "take[n] the risk, in revealing his affairs to another," that the third party would in turn provide that information to the government. *Id.*, at 443. A few years later, the Court in *Smith* v. *Maryland*, 442 U. S. 735 (1979), applied that principle to hold that a (landline) telephone subscriber lacked a legitimate expectation of privacy in the phone numbers he dialed. Once again, the Court reasoned that the subscriber had "voluntarily conveyed [the dialed numbers] to the telephone company," and so relinquished his Fourth Amendment right. *Id.*, at 744.

Opinion of the Court

In *Carpenter*, however, the Court rejected the Government's contention that the third-party doctrine likewise governed the acquisition of CSLI. The Court acknowledged that a cell-phone user "continuously reveals his location" to a third-party wireless carrier. 585 U. S., at 309. But it held that cell-phone location information is "qualitatively different" from "telephone numbers and bank records." *Ibid.* Those differences fell along two axes. First, the Court explained, the "nature" of CSLI is incomparably "revealing." *Id.*, at 314. There is "a world of difference" between the "exhaustive chronicle of location information casually collected by wireless carriers" and "the limited types of personal information addressed in *Smith* and *Miller*." *Ibid.* The former thus "implicates privacy concerns far beyond" the latter. *Id.*, at 315. And second, the Court continued, "[c]ell phone location information is not truly 'shared' as one normally understands the term." *Ibid.* Because "cell phones and the services they provide" are "such a pervasive and insistent part of daily life"—"indispensable to participation in modern society"—a person can hardly help but generate a "trail of location data." *Ibid.* "[I]n no meaningful sense," the Court thought, does that mean a person "voluntar[il]y expos[es]" to any third party a "comprehensive dossier of his physical movements." *Ibid.*

Both differentiating features highlighted in *Carpenter* apply equally or better to Location History. As noted above, Location History is even more "revealing" than CSLI, because it provides a yet more precise record of an individual's movements. See *supra*, at 16–17. Access to that record enables officials to undertake nearly perfect, retrospective surveillance of countless persons and places. See *supra*, at 17–18. And for Location History, that surveillance is based on information that a user reasonably understands as his own, even though stored on Google's servers—much like his emails, photos, and calendar entries. See *supra*, at 18. Likewise, the information is "not truly shared," in the

normal sense of wanting a third party to see or use it. *Carpenter*, 585 U. S., at 315. The exposure of that information to Google is merely what happens when a user avails himself of one of the services on his cell phone. Or said a bit differently, it is the automatic price of conventional cellphone usage—which, just as *Carpenter* noted, is a "pervasive and insistent part of daily life." *Ibid.* So just as the third-party doctrine did not apply in *Carpenter*, it does not apply here.

The Government contests that conclusion on *Carpenter*'s second axis alone: It claims that generating Location History, unlike producing CSLI, is a voluntary choice on the user's part. Although carrying a cell phone may be indispensable in modern society, the Government argues, using Location History is not. Rather, Location History is an "optional add-on," which a user must enable by an "affirmative act" beyond "powering up" a phone. Brief for United States 13, 22 (quoting *Carpenter*, 585 U. S., at 315). In support, the Government emphasizes that only around one-third of current Google accountholders have activated the service. See Brief for United States 22; see 1 App. 45. That goes to show, says the Government, that people can "live[] without" Location History. Brief for United States 22; see Tr. of Oral Arg. 92. And if that is true (the Government says), people who do use the feature have indeed "voluntar[il]y expos[ed]" all of their movements. *Carpenter*, 585 U. S., at 315.

But as an initial matter, that argument ignores some pertinent facts about how and why Google users turn on Location History. As described earlier, Google prompts a user, and repeatedly, to turn on the service—when he sets up a Google account, when he sets up an Android phone, and when he sets up a Google app. See *supra*, at 3–4. The prompt often informs him that his device will not "work correctly" unless he does so. 2 App. 140–141. By contrast, it does not tell him quite what he is signing up for: "how frequently Google would record [his] location"; "how precise

Opinion of the Court

Location History can be"; or how Google might give all that minute-by-minute location information to the government. 590 F. Supp. 3d, at 936; 136 F. 4th, at 128 (Wynn, J., concurring in judgment). In those circumstances, it is hard to see how any user is, in the normal sense, "sharing" with third parties a comprehensive catalog of his physical movements. *Carpenter*, 585 U. S., at 314. And that is so regardless of how many others ignore Google's entreaties. The Government's estimation of that number is almost surely overstated: It appears to include, for example, the many millions of Google accountholders in foreign countries like China where collecting Location History is illegal. See 4 Joint App. in No. 22–4489 (CA4), pp. 845, 848. But in any event, the raw user totals for Location History—one-third, two-thirds, or someplace in between—are not the most apt measure of whether that service's enlistees have, as the Government claims, self-consciously "assumed the risk of sharing" all their movements with others. Brief for United States 12.

More generally, the Government's approach to Fourth Amendment protection would raise a host of workability issues. At the top of the list: What percentage of users would have to sign up for a service to make doing so non-voluntary? The Government posited at argument that if 80 percent of active Google accountholders had enabled Location History, the case would be "much closer." Tr. of Oral. Arg. 92. After all, the Government candidly noted, even possessing a cell phone is not truly "indispensable" (to use *Carpenter*'s word): "[S]omething like 90 percent of people have [them]." Tr. of Oral. Arg. 92. So where to draw the line? And after that, the questions only multiply. Would a user lose Fourth Amendment protection if a highly popular cellphone feature became less so over time? What if the use of a given feature is ubiquitous among (but only among) a subset of the population (say, an age cohort), and an individual defendant is a member of that class? Would it be enough if

Opinion of the Court

the lion's share of cell-phone users enabled a feature similar to the one at issue—so, for example, any location-tracking service, whether Google's or some other company's?  And finally, a more basic inquiry: In such a world, how is anyone—whether a cell-phone user or a police officer—to know in advance (which is when the knowledge is useful) whether enrollees in a given service will be found to have Fourth Amendment protection in the information that service collects?  To ask all these questions about the Government's approach is to know that it is on the wrong track.

And there is yet a deeper problem: The Government's app-by-app, feature-by-feature method of granting Fourth Amendment protection misapprehends the very nature of modern cell-phone use.  Pretty much everything a person does on a smartphone requires some kind of opt-in—an "affirmative act" beyond "powering up" to utilize a given app or service. *Carpenter*, 585 U. S., at 315.  Consider sending an email on Gmail, uploading a photo to Google Photos, or adding a calendar entry to Google Calendar.  None happens solely by dint of the phone's operation; each requires, as Location History does, an "optional add-on."  Brief for United States 13.  And each activity, like using Location History, results in sharing information with a third-party tech company—turning over private materials to live on that company's servers.  The Government wishes to disconnect all those uses from the mere act of carrying a turned-on cell phone (the thing that generates CSLI), with only the latter receiving assured Fourth Amendment protection.  But that is to imagine that all of us are living in dumb flip-phone days.  The point of carrying smartphones is to use what is on them—as *Carpenter* said, to use the apps and "services they provide." 585 U. S., at 315. *That* is what has become a "pervasive and insistent"—even "indispensable"—"part of daily life." *Ibid*.; *Riley*, 573 U. S., at 385.  And so *that* is what *Carpenter* insulated from the third-party doctrine.  A cell-phone user is not to be viewed as sharing private

Opinion of the Court

information with third parties—which then can be freely passed on to the government—just by doing the ordinary things cell-phone users do.

\*    \*    \*

For all those reasons, we hold that police officers invade a cell-phone user's reasonable expectation of privacy when they access his Location History. It does not matter if the time period scrutinized was only two hours. Nor does it matter that the materials obtained were handed over by a third-party tech company. When the government "accesses historical cell phone" location information—Location History as much as CSLI—it "conducts a search under the Fourth Amendment." *Carpenter*, 585 U. S., at 300.

## III

That conclusion does not resolve this case, because the Fourth Amendment prohibits only searches that are "unreasonable." When law enforcement officials undertake a search to discover evidence of a crime, the reasonableness standard generally requires that they seek a warrant from "a neutral and detached magistrate." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948); see *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 653 (1995).[11] That requirement subjects the officials' assessment of a search's propriety to the "deliberate, impartial judgment of a judicial officer." *United States* v. *Grubbs*, 547 U. S. 90, 99 (2006). The magistrate, in turn, may issue a warrant only when "probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky* v. *King*, 563 U. S. 452, 459 (2011).

———————

[11] Our precedents recognize exceptions to that rule—most prominently, "when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Carpenter*, 585 U. S., at 319. Today's decision does not call into doubt, in such circumstances, a warrantless geofence search. See *id.*, at 320 (noting the same for "warrantless access to CSLI").

30    CHATRIE *v.* UNITED STATES

Opinion of the Court

When officers have obtained a warrant, as they did here, a search's legality will thus depend on whether a magistrate has properly found probable cause to support a particularly described search. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois* v. *Gates*, 462 U. S. 213, 232 (1983). But a magistrate must always determine that there is a "fair probability that contraband or evidence of a crime will be found" in the place searched. *Id.*, at 238. That means determining, to the requisite "fair probability," both that the place searched will have the materials sought and that those materials will contain evidence "aid[ing]" in a criminal's "apprehension or conviction." *Messerschmidt* v. *Millender*, 565 U. S. 535, 551, 552, n. 7 (2012); see *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 556 (1978) ("The critical element" is whether there is the requisite "cause to believe that the specific 'things' to be searched for and seized are located" in the targeted place). The particularity requirement, for its part, ensures that the search will be of an appropriate scope—that it is "carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland* v. *Garrison*, 480 U. S. 79, 84 (1987). That requirement typically looks to such matters as the geographic and durational expanse of the search. See *id.*, at 84–85; *Karo*, 468 U. S., at 718. And it too must take account of "particular factual contexts," including in surveillance cases the nature of the technology to be used. *Gates*, 462 U. S., at 232; see, *e.g.*, *Karo*, 468 U. S., at 718; see generally Kerr Brief 17–20.

The warrant issued here, as described earlier, was an uncommon, multi-step one. See *supra*, at 7–8. The first step it laid out authorized police officers to obtain location data for all cell phones inside the designated geofence within a one-hour timeframe. The second step entitled the officers

Opinion of the Court

to obtain additional data (two hours, both inside and outside the geofence) for a subset of those phones—of the officers' own choosing. And the third step enabled them to obtain personal identifying information (including names, email addresses, and phone numbers) for a further subset—again of their selection. As to how the officers would make their choices at the second and third steps—how they would pick the users subject to more intense scrutiny—the warrant said very little. *In toto*: They would "attempt to narrow down the list by reviewing the time stamped location coordinates for each [device] and comparing that against the known time and location information that is specific to this crime." 2 App. 136; see *id.*, at 137; *supra*, at 7–8.

The parties have contested the legality of each stage of that process. Chatrie analogizes the first step to an "unconstitutional general warrant," and argues that in any event the search at that step was both insufficiently described by the warrant and lacking in probable cause. Brief for Chatrie 12; see *id.*, at 13. As to steps two and three, Chatrie contends that the warrant left too much authority to police officers—and too little to the magistrate—to define the search's scope and determine whether cause for it existed. See *id.*, at 13–14. The Government, for its part, defends the warrant at every step as seeking "particularized information from Google's database" based on "probable cause to believe that Google had information" that would help solve a crime. Brief for United States 14. And the Government urges that the discretion given to the officers at steps two and three fell within the bounds of reasonableness. See *id.*, at 46.

We leave all of those questions to the Court of Appeals to decide in the first instance. Because the Fourth Circuit panel concluded that no search had occurred, it did not address whether the geofence warrant issued here validly authorized each stage of the search process. Nor did the en banc court's one-sentence *per curiam* opinion speak to that

32          CHATRIE *v.* UNITED STATES

Opinion of the Court

issue. We are, as we have said many times before, "a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). It is therefore now up to the Court of Appeals to decide whether, at each step of the search process, the warrant satisfied the Fourth Amendment's requirements of particularity and probable cause.

IV

In his famed and vindicated dissent, Justice Brandeis explained why a wiretap was a search, subject to Fourth Amendment requirements. See *Olmstead* v. *United States*, 277 U. S. 438, 471 (1928). Those who drafted the Amendment could not have imagined such a technology. But they understood, Justice Brandeis wrote, a matter of more transcendent importance: that Americans had "as against the Government, the right to be let alone" and that the Fourth Amendment must protect against "every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed." *Id.*, at 478.

Far more recently, this Court in *Carpenter* invoked Justice Brandeis's opinion in explaining why law enforcement officials could not have "unrestricted access to a wireless carrier's database of physical location information." 585 U. S., at 320. Said *Carpenter*: "[T]he Court is obligated—as '[s]ubtler and more far-reaching means of invading privacy have become available to the Government'—to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Ibid.* (quoting 277 U. S., at 473–474 (dissenting opinion)). For new technological tools, the Court continued, may "risk[] Government encroachment of the sort the Framers, after consulting the lessons of history, drafted the Fourth Amendment to prevent." 585 U. S., at 320.

Today's decision follows from the same judicial obligation, to guard against the same risk of undue encroachment. The Fourth Amendment applies, too, when officials tap into Google's "database of physical location

Opinion of the Court

information." *Ibid.* That database is new, but the principle covering it is not: That principle is instead the one our history has given. The Fourth Amendment must, as ever, protect against unjustified governmental intrusion on the privacy of the individual.

For the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 609 U. S. ____ (2026)          1

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 25–112

_____

## OKELLO T. CHATRIE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, concurring.

I agree with the Court that law enforcement officers conducted a search when they accessed petitioner Chatrie's Location History. I write separately because I would have gone further to explain that this search violated the Fourth Amendment. As the Court observes, "[w]hen officers have obtained a warrant," the validity of a search turns on "whether a magistrate has properly found probable cause to support a particularly described search." *Ante*, at 30. In my view, it is clear that at a minimum the second and third stages of the search process here did not satisfy this foundational requirement.

At step two, the warrant authorized officers to access an additional hour's worth of Location History, unbounded by the geofence's perimeter. Though the warrant stated that officers would "*attempt* to narrow down the list" of devices subject to this step, there was no explicit requirement that they do so. 2 App. 136 (emphasis added). Nor did the warrant set forth any criteria that officers would use in their narrowing efforts. *Ibid.*

The same infirmities carried over to step three. At this step, the warrant authorized officers to access "identifying account information," including the username, date of birth, account number, and any email addresses or

telephone numbers associated with the account. *Id.*, at 137. Once again, the warrant stated only that officers would "*attempt* to narrow down the list," without setting forth any criteria for doing so. *Ibid.* (emphasis added).

This "uncommon, multi-step" process, *ante*, at 30, meant that officers conducted key portions of the search outside the supervision of "a neutral and detached magistrate," *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). Put differently, officers could obtain additional, sensitive information at steps two and three without having to convince a magistrate that there was probable cause to believe this particular information would uncover evidence related to the crime. In this way, the warrant left "too much to the discretion of the officer[s] executing the order," giving them a "roving commission" to collect more data absent any justification to a magistrate. *Berger* v. *New York*, 388 U. S. 41, 59 (1967).

The facts of this case illustrate why the lack of magisterial oversight is dangerous. When executing steps two and three, law enforcement initially sought unbounded data and account information from *all* 19 devices identified at step one. See 590 F. Supp. 3d 901, 921 (ED Va. 2022). Nothing in the warrant prevented officers from obtaining this broad set of data; they narrowed the list only because Google insisted on it. The officers eventually settled on requesting data from nine devices at step two, but even this shorter list may have been overbroad. For three of the nine devices, the location data showed the users' movements to and from sensitive spaces—namely, residences, a school, and a hospital. See *id.*, at 923. Given how it was written, the warrant itself provided no "judicial check" on law enforcement's determination that probable cause justified this intrusion. *Steagald* v. *United States*, 451 U. S. 204, 220 (1981).

Cite as: 609 U. S. \_\_\_\_ (2026)                    3

JACKSON, J., concurring

\*    \*    \*

   The Court correctly observes that allowing the Govern-ment to "access all of a cell-phone user's movements" with-out limit essentially arms it with "a virtual panopticon with which to scrutinize its citizens' activities." *Ante*, at 21. It is for this reason that law enforcement and courts must carefully abide by the Fourth Amendment's instruction that "no Warrants shall issue, but upon probable cause, sup-ported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Circuit should keep this instruction in mind on remand when evaluating the constitutionality of the multi-step search that occurred here, especially at steps two and three.

GORSUCH, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

——————

No. 25–112

——————

## OKELLO T. CHATRIE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2026]

JUSTICE GORSUCH, concurring in the judgment.

I agree with the Court's judgment that the government's examination of Okello Chatrie's Location History data amounted to a search for purposes of the Fourth Amendment. But respectfully, I would reach that conclusion by a different route.

### I

To decide whether a Fourth Amendment search took place in this case, the Court once again invokes a test first advanced in a solo concurrence in *Katz* v. *United States*, 389 U. S. 347 (1967). Under that test, a search occurs when the government intrudes on an "expectation of privacy" that "society is prepared to recognize as 'reasonable.'" *Id.*, at 361 (Harlan, J., concurring).

If *Katz* has become a familiar feature of our law, it seems to me no more persuasive for it. Consider just a few of its problems, beginning with this: It has no basis in the Constitution's text or history. The Fourth Amendment's protections do not depend on "the breach of some abstract 'expectation of privacy' whose contours are left to the judicial imagination." *Carpenter* v. *United States*, 585 U. S. 296, 391 (2018) (GORSUCH, J., dissenting). Instead, the Fourth Amendment speaks in more concrete terms, protecting an individual's person, house, papers, and effects from

2              CHATRIE *v.* UNITED STATES

GORSUCH, J., concurring in judgment

unreasonable searches and seizures. *Ibid.* No surprise, then, that it's hard to find anything like the *Katz* test in the law leading up to the Fourth Amendment's adoption—or anything much like it in this Court's jurisprudence before the 1960s. See *Carpenter*, 585 U. S., at 391–392 (GORSUCH, J., dissenting).

Even if I could overlook that problem with *Katz*, I still wouldn't know how to apply it. As the Court has candidly admitted, it has never been able to identify a "single rubric" that might "definitively resolv[e] which expectations of privacy are entitled to protection." *Carpenter*, 585 U. S., at 304 (majority opinion). Maybe *Katz* poses an empirical question, tagging reasonable expectations of privacy to those privacy expectations "people *actually* have." *Carpenter*, 585 U. S., at 392 (GORSUCH, J., dissenting). Or maybe the question is a normative one, asking what expectations reasonable people "*should . . .* have." *Ibid.* In truth, nobody knows and, either way, this Court is the wrong body for the task. We aren't equipped to make empirical assessments about what most Americans think. Nor is it our job to enforce our own normative judgments, as opposed to those embodied in the Constitution and laws. *Id.*, at 392–394.

If this weren't trouble enough, we've also adorned *Katz* with an equally indefensible qualification called the third party doctrine. Under its terms, the Court has held, an individual maintains no "reasonable expectation of privacy" in information he shares with others. Accordingly, the government may freely search a person's papers and effects without triggering any Fourth Amendment scrutiny so long as they are entrusted to the care of someone else. See *Smith* v. *Maryland*, 442 U. S. 735, 743–744 (1979); *United States* v. *Miller*, 425 U. S. 435, 442–443 (1976).

Much as with *Katz* itself, this Court has never offered a persuasive justification for its offshoot. *Carpenter*, 585 U. S., at 389–390 (GORSUCH, J., dissenting). Nor do I see how it might. Do we seriously mean to suggest that most

GORSUCH, J., concurring in judgment

Americans think they have no "reasonable expectation of privacy" in records held for them by their banks or pharmacists or doctors or technology companies?  If not, on what authority might we rule that the American people should not reasonably expect privacy in materials like those?  Really, the third party doctrine amounts to little more than a "doubtful application of *Katz* that lets the government search almost whatever it wants whenever it wants." *Id.*, at 391.

As it did eight years ago in *Carpenter*, the Court today largely ignores these problems.  It simply declares that Mr. Chatrie enjoyed a reasonable expectation of privacy in his Location History because authorities could have used it to create "a virtual panopticon." *Ante,* at 21.  And it tells us that the third party doctrine does not apply to this case because Mr. Chatrie did "'not truly shar[e]'" his Location History with Google. *Ante,* at 25–26 (quoting *Carpenter*, 585 U. S., at 315 (majority opinion)).

Count me unpersuaded.  Why does tracking Mr. Chatrie's movements digitally over an hour or two invade his reasonable expectation of privacy when an officer tailing him for the same length of time would not?  See *United States* v. *Knotts*, 460 U. S. 276, 281–283 (1983).  Why is Location History data Mr. Chatrie voluntarily shared with Google not "truly shared" when a person's bank records are?  See *Miller*, 425 U. S., at 440–443.  Does the Court just mean to give *Katz*'s third party doctrine a quiet burial by suggesting today that any information shared over "smartphones" using "apps and services" falls outside its reach? *Ante,* at 28 (internal quotation marks omitted).  And what does any of this have to do with the Fourth Amendment's terms anyway?  Even if *Katz* and its battered third party doctrine may straggle on today, they leave our Fourth Amendment jurisprudence about where the Court's obscenity doctrine stood in the 1960s:  We know a "reasonable expectation of

4                    CHATRIE *v.* UNITED STATES

GORSUCH, J., concurring in judgment

privacy" (and an exception to the third party doctrine) when we see it.

## II

Rather than employ *Katz* and its third party doctrine, I would take a different approach. To decide whether the Fourth Amendment is in play, I would consult its terms, asking first whether Location History qualifies as one of Mr. Chatrie's papers or effects, and then asking whether the government searched those papers or effects. This traditional approach remains very much part of our law. See *Byrd* v. *United States*, 584 U. S. 395, 403 (2018). Indeed, we have expressly recognized that *Katz* and its progeny "supplemen[t] rather than displac[e]" traditional Fourth Amendment principles. *Carpenter*, 585 U. S., at 403 (majority opinion); see also *Soldal* v. *Cook County*, 506 U. S. 56, 64–65 (1992); *United States* v. *Jones*, 565 U. S. 400, 406–407 (2012); *Florida* v. *Jardines*, 569 U. S. 1, 11 (2013).

Thanks to *Katz*'s prominence today, of course, litigants sometimes fail to press more traditional Fourth Amendment arguments. See, *e.g.*, *Carpenter*, 585 U. S., at 406 (GORSUCH, J., dissenting). But whatever his faults (possibly including bank robbery), Mr. Chatrie has not forfeited that line of attack in this case. In fact, he begins his brief before us by contending that the Fourth Amendment is implicated here precisely because the government enlisted Google to search his "papers and effects." See Brief for Petitioner 15, 33.

I agree with that assessment. Set aside whether Location History data qualifies as among Mr. Chatrie's "papers," and consider whether it at least constitutes one of his "effects." Based on the evidence the parties have put before us, it appears the word "effects" was understood at the time of the Fourth Amendment's adoption to embrace most any kind of personal property. See, *e.g.*, M. Brady, The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due

GORSUCH, J., concurring in judgment

Protection, 125 Yale L. J. 946, 985–987 (2016) ("[E]arly sources indicate that the term 'effects' meant 'personal property' in common and colloquial usage"); L. Donohue, The Original Fourth Amendment, 83 U. Chi. L. Rev. 1181, 1301 (2016) (effects meant "personal property or possessions," including "commercial items and goods"); Brief for United States 32 (suggesting that "effects" excludes certain real property like so-called open fields (citing *Oliver* v. *United States*, 466 U. S. 170 (1984))).

As I see it, Mr. Chatrie's Location History data qualifies as his personal property. To appreciate why, start with this. As Google puts it, and no one seriously disputes, Location History serves as a "diary" or map "of a person's travels." Brief for Google LLC as *Amicus Curiae* 3–4. At the time of the events in question, Mr. Chatrie's agreement with Google referred to Location History as "*your*" (meaning, the user's) "information." 1 App. 72 (emphasis added). Under the parties' agreement, too, Mr. Chatrie was free to "review" and "edit" his location data. *Id.*, at 19. He was even free to export or delete that data "from Google's servers at will." *Ibid.* Beyond all that, Google promised to protect his information against "unauthorized access, alteration, disclosure, or destruction." *Id.*, at 71. Put simply, Mr. Chatrie had the rights to enjoy, manage, alter, dispose, and exclude others from what amounted to an electronic diary or map of his travels. And as someone who held that many "sticks in the bundle of rights . . . commonly characterized as property"—including the "most treasured" and "essential" right to exclude—he has a strong claim that the Location History data was his personal property. *Cedar Point Nursery* v. *Hassid*, 594 U. S. 139, 149–150 (2021) (internal quotation marks omitted).

Next, notice what statutory and case law have to say on the subject. The investigation of Mr. Chatrie unfolded in Virginia. That State's Computer Crimes Act expressly describes "computer data" as a form of "[p]roperty." Va. Code

6                 CHATRIE *v.* UNITED STATES

Gorsuch, J., concurring in judgment

Ann. §18.2–152.2 (2021). Altering or making an unauthorized copy of computer data can constitute the crime of "computer trespass" (another property law concept). §§18.2–152.4(A)(3), (6). And the State provides a right to sue for anyone "whose property or person is injured" by violations of the Act (again suggesting a right to exclude). §18.2–152.12(A).

Nor is Virginia some outlier. In Texas, "computer . . . data" can constitute "[p]roperty." Tex. Penal Code Ann. §33.01(16) (West Cum. Supp. 2025). State law likewise criminalizes "knowingly access[ing] . . . a computer, computer network, or computer system . . . with the intent to obtain or use a file, data, or proprietary information" for a prohibited purpose. §33.02(b–1)(2)(C) (West 2016). Once more, as well, those whose "property has been injured" by certain computer crimes may bring a "civil cause of action." Tex. Civ. Prac. & Rem. Code Ann. §143.001 (West 2019). Georgia has a similar regime. See Ga. Code Ann. §§16–9–93(b), (g) (2018) (criminalizing "[c]omputer [t]respass" and providing a private right of action for such violations). And, it appears, so do many other States. See Brief for Cato Institute as *Amicus Curiae* 14–15, and n. 5 ("Today, more than half of states . . . treat digital records and data as personal property," and "[m]any" of them "make it illegal for private actors to access or convert another person's digital data"); see also, *e.g.*, *People* v. *Seymour*, 536 P. 3d 1260, 1273 (Colo. 2023) (finding that "law enforcement's copying of [the defendant's] search history meaningfully interfered with his possessory interest in that data"); *Integrated Direct Marketing, LLC* v. *May*, 2016 Ark. 281, p. 6, 495 S. W. 3d 73, 76 ("[U]nder Arkansas law, intangible property, such as electronic data, . . . can be converted"); cf. *Thyroff* v. *Nationwide Mut. Ins. Co.*, 8 N. Y. 3d 283, 292–293, 864 N. E. 2d 1272, 1278 (2007) (holding that "electronic records that were stored on a computer and were indistinguishable from printed documents" are "subject to a claim of conversion").

GORSUCH, J., concurring in judgment

To be sure, pursuant to its agreement with Mr. Chatrie, Google stored his Location History data on its servers and was free to use it for certain purposes. Brief for United States 34–36. But an individual need not have "complete ownership or exclusive control" before he can assert a Fourth Amendment challenge against the search of real property. *Carpenter*, 585 U. S., at 401 (GORSUCH, J., dissenting). Instead, we have long recognized, a "tenan[t] [or] resident family membe[r]" who does not enjoy "fee simple title" in a house has a sufficient interest in it to give rise to a Fourth Amendment right. *Ibid.* And I fail to see why the law should differ markedly when it comes to personal property. If you "[t]oss your keys to a valet at a restaurant" or "[a]sk your neighbor to look after your dog while you travel," you may entrust your personal property to another and license him to do certain things with it, much as Mr. Chatrie did with his Location History data. *Id.*, at 399. But that hardly means that property is no longer yours. *Ibid.*

Nor does it matter that those who wrote the Fourth Amendment might not have imagined an electronic diary or map of one's travels. As with other laws, the terms found in the Fourth Amendment carry their original public meaning and can bear more applications than its drafters might have expected or intended. See *id.*, at 400. So just as the First Amendment protects speech over the internet today no less than it did speech delivered in the town square in 1791, it should hardly come as a surprise that the Fourth Amendment might protect as personal "effects" electronic diaries of one's travels as it always has more traditional ones. See *Kyllo* v. *United States*, 533 U. S. 27, 40 (2001) (observing that a "search" of a home can take place not just by physical entry but also by the external use of thermal-imaging devices).

Because Mr. Chatrie's Location History data is his effect, it is subject to the Fourth Amendment's restrictions when the government searches it. So, was there a search? The

8                    CHATRIE *v.* UNITED STATES

government conducts a search when it "'look[s] over or through for the purpose of finding something.'" *Id.*, at 32, n. 1 (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)). Under our precedents, none of which the government asks us to overrule, a search equally transpires when government officials enlist private parties in that task. See *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 614 (1989) (Fourth Amendment "protects against" searches "effected" by a private party "if the private party acted as an instrument or agent of the Government"). And that's exactly what occurred here: The government conducted a search both when it compelled Google to rummage through Mr. Chatrie's data at "step one," and when it later examined that data for itself and demanded more data yet from Google at "step two." See *ante,* at 7–8 (describing the stepwise process in which the searches were conducted in this case).

*

I might have hoped that the Court would have pursued a more traditional approach to the Fourth Amendment today. But look carefully and you will see hints of it at work even in the Court's opinion. Why is the Court so protective of Location History data, email, and electronically stored photos and calendars? See *ante,* at 25–26. Because, it turns out, "a user reasonably understands" all those things "as his own." *Ante,* at 25. Put another way, they are his effects. And why does the Court hold Mr. Chatrie's effects protected by the Fourth Amendment even though a third party stores them? Because, the Court says, those effects remain his "even though [they are] stored on Google's servers." *Ibid.* Put another way, entrusting your effects to a third party for certain agreed purposes doesn't mean they are no longer yours. While more work may lie ahead to bring coherence

Cite as: 609 U. S. ____ (2026)          9

GORSUCH, J., concurring in judgment

to our Fourth Amendment jurisprudence, perhaps this is a start.

Cite as: 609 U. S. ____ (2026)          1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 25–112
_____

## OKELLO T. CHATRIE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2026]

JUSTICE ALITO, with whom JUSTICE THOMAS joins as to Part I and with whom JUSTICE BARRETT joins as to Parts II–B, II–C–1, and II–C–2, dissenting.

Eight years ago, I warned that this Court's decision in *Carpenter* v. *United States*, 585 U. S. 296 (2018), would produce one of two outcomes. Either the Court would need to clarify *Carpenter*'s limits in a future decision, or *Carpenter* would usher in "revolutionary developments" in our doctrine by giving criminal suspects a "protected Fourth Amendment interest in any sensitive personal information about them that is collected and owned by third parties." *Id.*, at 385 (ALITO, J., dissenting). Today, the Court takes the country down the latter path. In doing so, the Court sheds *Carpenter*'s self-imposed boundaries and further destabilizes longstanding Fourth Amendment jurisprudence.

To make matters worse, the majority does all this in an advisory opinion. Although today's decision will send seismic waves through our Fourth Amendment doctrine, not one iota of the majority opinion will affect the outcome of this case. The Court knows this and does not claim otherwise. Indeed, by refusing to review the one question that could have at least theoretically given Chatrie some hope of relief, the Court carefully set the stage for its planned performance: striking a pose as a great champion of privacy in

2                CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

the digital age. I cannot support this irresponsible esca-
pade.

I

The Court should not have granted certiorari in this case,
and under any faithful application of our precedents, it
should now either dismiss this petition or affirm the deci-
sion below based on the "good-faith exception" to the exclu-
sionary rule. Instead, the Court issues an advisory opinion
concerning a now-obsolete "geofence" procedure. Last
Term, the Court worried out loud about rushing in to judge
"new technologies with transformative capabilities" that we
barely understand. *TikTok Inc.* v. *Garland*, 604 U. S. 56,
62 (2025) (*per curiam*). In cases involving such technology,
the Court proclaimed, we should take care not to "'embar-
rass the future.'" *Ibid.* (quoting *Northwest Airlines, Inc.* v.
*Minnesota*, 322 U. S. 292, 300 (1944)). Today, the Court ex-
hibits no such modesty.

A

It has long been established that federal courts may not
issue "advisory opinions" that do not bear on the rights of
the litigants before them. *Lewis* v. *Continental Bank Corp.*,
494 U. S. 472, 477 (1990). At the appellate stage, this prin-
ciple means that courts should resolve only those questions
on which a favorable ruling would provide a litigant redress
from the judgment below. See *Food Marketing Institute* v.
*Argus Leader Media*, 588 U. S. 427, 432–433 (2019). The
question on which the Court granted certiorari in this case
cannot satisfy this requirement under any colorable view of
the law. The Court should therefore decline to answer it.

Okello Chatrie's ongoing stake in this case stems from his
conviction for robbing a bank and brandishing a firearm.
On appeal, Chatrie challenged those convictions on only one
ground. He argued that the District Court erred in denying
his motion to suppress the fruits of the geofence procedure

ALITO, J., dissenting

that led to his identification as the bank robber.[1]  So, unless he can show that this evidence should be suppressed, he cannot obtain any relief.  And his chances of making the showing needed to justify suppression are virtually zero.

The police obtained information about Chatrie's location at the time of the robbery pursuant to a warrant issued by a neutral magistrate.  And when evidence is obtained under such a warrant, a defendant seeking suppression must overcome the good-faith exception to the exclusionary rule. *United States* v. *Leon*, 468 U. S. 897, 923 (1984).  A majority of the Court of Appeals for the Fourth Circuit, sitting en banc, held that Chatrie could not do so.  136 F. 4th 100, 101 (2025) (Diaz, C. J., concurring); *id.*, at 114 (Niemeyer, J., concurring); *id.*, at 115 (King, J., concurring); *id.*, at 115, n. 1 (Winn, J., concurring in judgment); *id.*, at 142 (Heytens, J., concurring).  That holding suffices to affirm the District Court's admission of the geofence evidence and thus independently supports the Fourth Circuit's judgment.  Accordingly, any review by this Court should concern an issue that could at least plausibly disturb that good-faith holding.  Cf. *Stewart* v. *IHT Ins. Agcy. Group, LLC*, 990 F. 3d 455, 457 (CA6 2021).

On this score, today's decision fails.  The majority does not dispute the Fourth Circuit's good-faith analysis, and nothing in its opinion casts a shred of doubt on that holding.  See *ante*, at 10, n. 4.  To overcome the good-faith exception, Chatrie would need to show that either (1) the affidavit supporting the geofence warrant was knowingly or recklessly

_____

[1] The majority characterizes the issue as whether the Government may introduce the location information that the police obtained through the geofence procedure.  But Chatrie also sought to suppress all the fruits of that location information, and these could potentially include a firearm matching one used in the crime, nearly $100,000 of currency in bands bearing the bank teller's signature, and his confession to the crime.  See Defendant's Motion to Suppress in No. 3:19–cr–00130 (ED Va.), ECF Doc. 29; Statement of Facts, ECF Doc. 229, p. 3.

4                 CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

false, (2) the magistrate rubber-stamped the warrant application, (3) the affidavit was "'bare bones,'" or (4) the warrant application was so facially deficient that no reasonable officer would rely on it. *Leon*, 468 U. S., at 923, and n. 24. Yet nothing in the majority opinion touches on any of these matters. Thus, nothing in today's decision bears on the Fourth Circuit's good-faith holding. And because that holding independently supports the judgment below, the Court's opinion is advisory.[2]

This outcome was guaranteed as soon as this Court granted certiorari. When seeking review in this Court, Chatrie recognized that dislodging the Fourth Circuit's judgment required that he prevail on the good-faith issue, so his petition asked us to alter the good-faith exception. See Pet. for Cert. i, 34–37 (asking the Court to create a carve-out to the good-faith exception). Yet the Court excluded the good-faith issue from its grant of certiorari, 607 U. S. 1148 (2026), ensuring that any opinion would be advisory. Indeed, even if the Court were to decide that the

———————

[2] I do not contend that the Court lacks Article III jurisdiction over this case as a formal matter. Chatrie's conviction suffices to render this litigation a "case or controversy," regardless of the question on which the Court granted certiorari. The majority opinion is nonetheless advisory— not because I think "the odds are strong" that Chatrie will lose on remand, contra, *ante*, at 10, n. 4., but because the majority opinion does not disturb the basis for the Fourth Circuit's judgment and thus Chatrie's conviction. This Court's longstanding policy against issuing advisory opinions on constitutional issues is not limited to cases where we lack jurisdiction. See, *e.g.*, *Rescue Army* v. *Municipal Court of Los Angeles*, 331 U. S. 549, 568 (1947) (holding that the Court possessed jurisdiction over a case but nonetheless declining to exercise it because the Court's policy against issuing gratuitous constitutional opinions "has not been limited to jurisdictional determinations"); *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*, 113 U. S. 33, 39 (1885) ("In the exercise of [its] jurisdiction, [this Court] is bound . . . never to anticipate a question of constitutional law in advance of the necessity of deciding it"). An opinion composed exclusively of dicta is no less advisory simply because the Court has jurisdiction to pronounce such dicta.

ALITO, J., dissenting

warrant in this case was deficient, there would be no color-able argument on remand that all reasonable officers would have correctly predicted that outcome. See *Leon*, 468 U. S., at 923. After all, this Court has never provided guidance on how to apply the Warrant Clause when the police request geolocation data from a third party. See *Carpenter*, 585 U. S., at 316–320 (noting only that such a warrant requires probable cause). Accordingly, it would be nearly impossible for Chatrie to prove that the police here (and, by extension, every other officer who ever relied on this type of geofence warrant) acted in bad faith. See *Davis* v. *United States*, 564 U. S. 229, 240 (2011) (Fourth Amendment violations "trigger the harsh sanction of exclusion only when they are deliberate . . . and culpable"). In sum, no resolution of the question on which the Court granted certiorari could have disturbed the Fourth Circuit's good-faith holding and, thus, its judgment.

The Court therefore erred by granting certiorari, and we should now dismiss this petition as improvidently granted. See *Conway* v. *California Adult Authority*, 396 U. S. 107, 110 (1969) (*per curiam*) (dismissing when resolving the issue addressed in the petition would produce an advisory opinion). Alternatively, this Court could affirm the decision below on good-faith grounds. Although the Court did not grant certiorari on this question, we may affirm a judgment on any ground supported by the record, and we would not be the court of "first view" on the good-faith issue. *Upper Skagit Tribe* v. *Lundgren*, 584 U. S. 554, 560–561 (2018). The Government properly presented this issue below, the District Court admitted the contested evidence on good-faith grounds, a majority of the en banc Fourth Circuit voted to affirm on that basis, and the Government continued to press good faith at the petition and merits stages in this Court. See Government's Response in Opposition to Defendant's Motion for Suppression, ECF Doc. 41, p. 21; 590 F. Supp. 3d 901, 937 (ED Va. 2022); Brief in Opposition

6 CHATRIE *v.* UNITED STATES

13; Brief for United States 47–48. This Court therefore has every reason to affirm on that ground.

Instead, the Court charges forward to decide the question presented, even though the majority cannot discern any impact that its decision has on the Fourth Circuit's judgment. See *ante*, at 10, n. 4. The majority thus issues a plainly advisory opinion, violating this Court's "oldest and most consistent" justiciability rule. *Flast* v. *Cohen*, 392 U. S. 83, 96 (1968) (internal quotation marks omitted).

## B

Advisory-opinion concerns aside, our prudential certiorari considerations further counseled against granting certiorari. Writs of certiorari are discretionary, and we reserve them for "compelling" cases in which the court below "has decided an important question of federal law." This Court's Rule 10. The question in this case does not qualify.

Chatrie's petition asked whether the geofence procedure that the police used here comports with the Fourth Amendment. The answer to this question has scarcely any ongoing significance. Google, the Government, and the majority all agree that Google has modified its Location History service in a manner that forecloses future use of this geofence procedure. *Ante*, at 4, n. 2; Brief for Google LLC as *Amicus Curiae* 2; Brief for United States 42, n. 3. Chatrie does not offer any evidence to the contrary. See Tr. of Oral Arg. 17–18; Brief for Petitioner 5; Pet. for Cert. 10–11. As a result, Fourth Amendment challenges to this geofence procedure will likely pass into obscurity soon.

This Court has long been averse to granting certiorari on questions "that time [will] soon bury." *Darr* v. *Burford*, 339 U. S. 200, 227 (1950) (Frankfurter, J., dissenting). This aversion applies with special force here given this case's subject matter. The Fourth Amendment's application to surveillance technology turns on the "unique nature" of the technology involved and the way in which the police use it

ALITO, J., dissenting

to collect information. *Carpenter*, 585 U. S., at 309. For instance, when determining whether law enforcement's use of a technology requires a warrant or is otherwise "unreasonable," this Court has considered the technology's capabilities, prevalence, costliness, conspicuousness, intrusiveness, precision, accuracy, security, and comprehensiveness. See, *e.g.*, *Kyllo* v. *United States*, 533 U. S. 27, 34–35 (2001); *United States* v. *Jones*, 565 U. S. 400, 429–431 (2012) (ALITO, J., concurring in judgment); *Maryland* v. *King*, 569 U. S. 435, 446–465 (2013); *Birchfield* v. *North Dakota*, 579 U. S. 438, 461–464 (2016); *Carpenter*, 585 U. S., at 310–313. Because these qualities vary from one technology to the next, the specific application of the Fourth Amendment does as well. Such variability renders this case all the less suitable for our review. Whatever one's jurisprudential views about the Fourth Amendment in the digital age, a case concerning a now-obsolete geofence procedure is an odd vehicle for pronouncing them.

None of this is to say that today's decision will be inconsequential. As the majority works its way through the question in this case, it makes sweeping proclamations with implications far beyond the specific procedure that the police used here. But this fact only underscores the advisory nature of today's decision. The majority has candidly little to say about the relevance of its decision for Chatrie's conviction. *Ante*, at 10, n. 4. Instead, the Court uses this case as a vehicle to once again "make a statement about privacy in the digital age." See *Carpenter*, 585 U. S., at 386 (ALITO, J., dissenting). Because that function is not a proper use of this Court's certiorari docket, we should not have granted this petition and should now dismiss it.

## II

The Court's resolution of the merits of this case is equally flawed. Applying the Fourth Amendment to 21st-century investigation methods is undoubtedly an important and

challenging task, and the Court ought to proceed cautiously. Yet the majority, faced with only countervailing authority in the first two centuries of this Court's case law, relies almost exclusively on our decision in *Carpenter*. And rather than moderate *Carpenter*'s departures from long-established Fourth Amendment law, the majority propels that decision's disruption to new heights.

## A

If the Court were to apply the Fourth Amendment as understood for the first century of this Nation's history, we would find no "search" of Chatrie's papers or effects, much less an "unreasonable" one. Until the last decades of the 19th century, the Search and Seizure Clause protected only the physical security of one's person and property, and document-production orders were not understood to be "searches." See *Katz* v. *United States*, 389 U. S. 347, 367–374 (1967) (Black, J., dissenting); *Carpenter*, 585 U. S., at 348–357 (THOMAS, J., dissenting); *id.*, at 363–372 (ALITO, J., dissenting). Under those principles, Chatrie's arguments are meritless.

To illustrate this point, imagine that Chatrie spent his free time taking road trips across the United States. And suppose that he entered into a contract with a travel agency, under which the agency would provide him valuable information about places to visit and activities to try as he traveled from place to place. Suppose that the contract, in exchange for these services, authorized the travel agency to maintain a detailed chronicle of Chatrie's adventures and to use that information to develop its business, expand its offerings, and advertise to prospective customers. If a grand jury had subpoenaed the travel agency for the records of Chatrie's travels, he would have no basis to object on search-and-seizure grounds. At least through the late 19th century, compelled document-production orders were simply not "searches."

ALITO, J., dissenting

Likewise, until *Carpenter*, this Court held that the Fourth Amendment protected a person's security in only his own papers and effects, not those of a third party. *Carpenter*, 585 U. S., at 328 (Kennedy, J., dissenting); *id.*, at 342; (THOMAS, J., dissenting); *id.*, at 379–385 (ALITO, J., dissenting). Chatrie's claim would therefore fail for a second reason: He possesses no property interest in the information that Google conveyed to the police. To be sure, Chatrie claims a property right in Google's Location History files under a bailor-bailee relationship, and he claims that the execution of the geofence procedure transgressed those rights. This argument radically reconceptualizes the traditional understanding of property rights. Cf. C. Reich, The New Property, 73 Yale L. J. 733 (1964). And even if Chatrie possessed a property right in the Location History files on Google's servers, the conduct of the police in this case did not infringe that right. The geofence procedure did not give the police access to the Location History files themselves. Rather, Google used the information contained in those files to generate a spreadsheet that summarized objective, historical facts about Chatrie's (and others') location in the hour before and hour after the robbery. See Decl. of S. Rodriguez, ECF. Doc. 96–2, pp. 2–3; 107 F. 4th 319, 324 (CA4 2024). The police sought and obtained those historical details, not the files on Google's servers. And whatever property rights Chatrie might have in the Location History files, he does not "own" historical facts about his movements in a given hour. If Chatrie, instead of using Location History, had written and copyrighted a private memoir about his crimes, he would not have a Fourth Amendment claim if the police asked a proofreader whether Chatrie was at the credit union during the robbery. Cf. *International News Service* v. *Associated Press*, 248 U. S. 215, 234 (1918) (distinguishing between having a property interest in a newspaper article and having a property interest in the historical facts set forth in the article). Chatrie therefore cannot

10                CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

show that the police here transgressed any rights in his papers or effects.

In short, under traditional search-and-seizure principles, Chatrie could not challenge the geofence procedure here under the Fourth Amendment.

## B

### 1

In the 20th century, this Court expanded its Fourth Amendment doctrine to protect more than the physical security of one's person and property. Beginning in *Katz*, the Court held that the Fourth Amendment also protects a person's "reasonable expectation of privacy" from government intrusions. 389 U. S., at 360 (Harlan, J., concurring); see also *id.*, at 351–353 (majority opinion).

Whatever one thinks of *Katz*'s expansion of Fourth Amendment doctrine, this Court at least had the prudence to tread cautiously when implementing that expansion. Indeed, the Court spent much of the 20th century emphasizing the limits of *Katz*'s reach. For instance, the Court held that *Katz* did not require the police to obtain a warrant for visual or physical surveillance outside a house's curtilage. *Oliver* v. *United States*, 466 U. S. 170, 178 (1984). Nor could a defendant generally claim an "expectation of privacy" in someone else's home, his own public travels, his face-to-face conversations with another person, or information that he shared with a business. *Minnesota* v. *Carter*, 525 U. S. 83, 89–91 (1998); *United States* v. *Knotts*, 460 U. S. 276, 281–282 (1983); *United States* v. *White*, 401 U. S. 745, 751–752 (1971) (plurality opinion); *Smith* v. *Maryland*, 442 U. S. 735, 744 (1979). If *Katz* ushered in a revolution in Fourth Amendment doctrine, the Court was quick to cabin its impact. See also *New York* v. *Burger*, 482 U. S. 691, 693, 700 (1987) (holding that *Katz* does not require a warrant for inspections of "pervasively regulated industries"); *California* v. *Greenwood*, 486 U. S. 35, 40–41 (1988) (holding that *Katz*

ALITO, J., dissenting

does not protect privacy interests in household garbage left curbside); *California* v. *Ciraolo*, 476 U. S. 207, 213–215 (1986) (holding that *Katz* does not require a warrant for aerial surveillance).

Similarly, even after *Katz*, the Court recognized that legislatures still bore primary responsibility for regulating the use of new technologies and investigation methods. Thus, when legislatures developed reasonable schemes to administer such activities, the Court was reluctant to constitutionalize additional rules. See, *e.g.*, *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534–539 (1967) (upholding the constitutionality of a search conducted pursuant to "reasonable legislative or administrative standards"); *King*, 569 U. S., at 465 (holding that a DNA collection scheme was constitutional in part because state statute regulated how records could be used); see also *Burger*, 482 U. S., at 707–711 (allowing warrantless inspections pursuant to a regulatory scheme designed to combat modern problems with car theft). As much as *Katz* reflected a departure from traditional Fourth Amendment rules, this Court's decisions made clear that it was a measured one.[3]

### 2

The geofence procedure in this case did not violate Chatrie's Fourth Amendment rights under these 20th-century precedents. These precedents hold that a defendant does not have a reasonable expectation of privacy in records that a company generates by virtue of the defendant's use of its services. This rule has come to be known as the third-party doctrine. The Court articulated this rule in *United States* v. *Miller*, 425 U. S. 435 (1976), holding that the police did not violate a defendant's Fourth Amendment rights when

---

[3] Contrary to the Court's characterization of my argument, *ante*, at 11, n. 5, my purpose in recounting the developments in this Court's post-*Katz* case law is to contrast the Court's modesty during that period with its maximalist extension of *Carpenter* today.

12                  CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

they obtained transaction records from his bank. In reaching this conclusion, *Miller* emphasized that a bank is not merely a neutral custodian of its customers' financial information, but rather a party to an ongoing business relationship with them. *Id.*, at 440–441. Thus, when the defendant "voluntarily conveyed" his financial information to a bank by depositing money or cashing checks, he assumed the risk that the bank would create a paper trail of that information for its own business purposes. *Id.*, at 442. The defendant likewise assumed the risk that the bank might share that information with others, including the police. *Ibid.* The Court therefore held that the defendant had no Fourth Amendment rights in the bank's records of his transactions.

What was true about the bank records in *Miller* is true about Location History here. Chatrie voluntarily conveyed his location information to Google, and Google created a digital paper trail of that information. Like the bank in *Miller*, Google was no neutral custodian in this arrangement. *Id.*, at 440. In exchange for allowing Chatrie to use its Location History service, Google could use his location information for its own business purposes, such as sending Chatrie location-targeted advertisements from third parties. 590 F. Supp. 3d, at 907–908. So, by giving Google his location information for its own use, Chatrie assumed the risk that Google might disclose location information to others, including the police. *Miller*, 425 U. S., at 443. Indeed, Google advises its users that the company could use their location information for its own advertising purposes and could share that information with law enforcement. *E.g.*, 1 App. 69–70. Thus, like the defendant in *Miller*, Chatrie cannot now claim a reasonable expectation of privacy in those data. The police therefore would not need a warrant to perform the geofence procedure under our 20th-century precedents.

ALITO, J., dissenting

## C

### 1

Without any support in 19th- or 20th-century under-standings of the Fourth Amendment, Chatrie and the ma-jority rely primarily on this Court's decision in *Carpenter*. *Carpenter* held that the police must obtain a warrant before ordering a cellular carrier to provide more than six days of cell-site records about a customer (*i.e.*, information about the specific cell towers to which a cell phone connected). 585 U. S., at 315–316. Like *Katz*, *Carpenter* extended the Fourth Amendment's warrant requirement to encompass a category of government investigations that it had never previously covered. Before *Carpenter*, a criminal defendant who objected to police collection of cell-site records would have faced at least two legal hurdles: the historical distinc-tions between searches and subpoenas *duces tecum*, and the third-party doctrine. *Carpenter*, 585 U. S., at 361–362 (ALITO, J., dissenting). *Carpenter* thus reflected a "stark departure" from both traditional Fourth Amendment prin-ciples and this Court's 20th-century doctrine. *Id.*, at 321 (Kennedy, J., dissenting).

Nonetheless, *Carpenter* maintained that its departure from these doctrines was "narrow." *Id.*, at 316 (majority opinion). The question presented in *Carpenter* was whether the Fourth Amendment allows "the warrantless seizure and search of historical cell phone records revealing the lo-cation and movements of a cell phone user over the course of 127 days," Pet. for. Cert. in *Carpenter* v. *United States*, O. T. 2017, No. 16–402, p. i, and the Court purported to re-solve no more than the question before it, 585 U. S., at 316, and n. 4. *Carpenter*'s analysis likewise anchored itself in the "unique nature" of the particular cell-site records that the police had collected in that case. *Id.*, at 315. In "declin[ing] to extend" the third-party doctrine to weeks-long cell-site records, *Carpenter* highlighted various aspects of that dataset that, in the majority's view, afforded the

14                CHATRIE *v*. UNITED STATES

ALITO, J., dissenting

defendant a stronger expectation of privacy than the defendants in our earlier third-party precedents. *Ibid*.

Three of those aspects—duration, comprehensiveness, and voluntariness—deserve mention here. First, unlike traditional police-surveillance techniques, the dataset in *Carpenter* captured the "whole of [a person's] physical movements" over 127 days, violating Americans' reasonable expectation that they would not be "secretly monitor[ed]" for a "very long period." *Id*., at 310 (internal quotation marks omitted). Second, the dataset gave the police an "all-encompassing record" of the defendant's whereabouts that tracked him "beyond public thoroughfares and into private residences . . . and other potentially revealing locales." *Id*., at 311. Third, the Court determined that cell-phone users do not "voluntarily" share their cell-site information with cellular carriers in the same way that the defendant in *Miller* voluntarily conveyed his transaction information to a bank. *Carpenter*, 585 U. S., at 315. The Court reasoned that because cell phones are "indispensable to participation in modern society" and "[v]irtually any activity on [a] phone" generates cell-site records, a person has no practical choice but to constantly convey this information to third parties. *Ibid*. Based on these aspects of the dataset at issue, *Carpenter* concluded that the defendant had a strong enough privacy expectation that the rationale undergirding our third-party case law did not apply. *Id*., at 314–315. *Carpenter* therefore held that the police needed a warrant to obtain seven or more days of cell-site records from a cellular carrier. *Id*., at 310, n. 3, 316.

2

*Carpenter* did not require the police to obtain a warrant for the geofence procedure here. By its own terms, *Carpenter*'s holding was keyed to the "unique nature" of the cell-site records in that case. *Id*., at 309, 315. *Carpenter* expressly left open the question whether the police would

ALITO, J., dissenting

need a warrant for location data spanning less than a week, as is the case with the data here. *Id.*, at 310, n. 3. *Carpenter* likewise declined to address situations where the police request information about all devices in a given area at the time of a crime (*e.g.*, a geofence procedure), as opposed to continuous location information about one specific device. *Id.*, at 316. For this reason alone, *Carpenter* does not dictate an outcome here.

Nor does *Carpenter*'s reasoning justify extending its holding to this case. Here, the police requested two pieces of information that could implicate Chatrie's Fourth Amendment interests: (1) whether he was within 150 meters of the credit union during the robbery, and (2) if he was, where he traveled during the 1-hour periods immediately before and afterward. Along three of the dimensions that *Carpenter* found relevant, Chatrie has a far lesser privacy interest in this information than the defendant did in the records at issue in that case. The third-party doctrine therefore controls.

First, unlike the data collection in *Carpenter*, the geofence procedure in this case did not risk uncovering the "whole of [someone's] physical movements." 585 U. S., at 310. In contrast to the 127 days of cell-site records in *Carpenter*, the request made by the police here spanned just two hours.[4] Until today, this Court had recognized a Fourth Amendment difference between tracking a person's movements for a "brief stretch" and cataloging them for an "'extended period of time.'" *Ibid.*; *Jones*, 565 U. S., at 430 (opinion of ALITO, J.). Although it might be difficult to "identify with precision" the dividing line between these two durations, a 2-hour stint of location tracking is "surely" too limited to constitute the "all-encompassing record" that

_____

[4] In accurately noting that the data at issue in *Carpenter* spanned 127 days, I do not dispute that *Carpenter* drew the constitutional line at seven days. It is the majority that eschews *Carpenter*'s 7-day line. *Ante*, at 18–23.

16                    CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

triggered heightened privacy concerns in *Carpenter*. *Jones*, 565 U. S., at 430 (opinion of ALITO, J.); *Carpenter*, 585 U. S., at 311.

Second, the limited geofence procedure here was far less likely to open "an intimate window" into Chatrie's "'familial, political, professional, religious, and sexual associations'" than was the chronicle that the police obtained in *Carpenter*. *Id.*, at 311. Whereas the procedure in *Carpenter* gave the police a comprehensive log of the defendant's movement everywhere he went, the geofence's boundaries here centered on a credit union,[5] a public place where individuals lack a reasonable expectation of privacy.[6] Cf. *Miller*, 425 U. S., at 442–443 (holding that a person has no expectation of privacy in his dealings with a bank); *Knotts*, 460 U. S., at 281–282 (holding that a person has no expectation of privacy in his travels through public places). To be sure, the geofence procedure also captured some people's movements outside the geofence in the hour before and after they visited the credit union, and it is feasible that some people might have traveled to a private location during that window. But the incidental acquisition of such information through otherwise-permissible surveillance does not violate Chatrie's Fourth Amendment rights. *Id.*, at 282 (holding that no search of the defendant occurred when a police

———————

[5] The geofence also encompassed a nearby church, but Chatrie has not claimed an expectation of privacy in that church. The church therefore has no bearing on whether the geofence procedure in this case violated *his* Fourth Amendment rights, and Chatrie may not vicariously assert others' rights in support of his suppression motion. See *Rakas* v. *Illinois*, 439 U. S. 128, 148–150 (1978).

[6] The majority correctly notes that under my interpretation of *Carpenter*, the police could use a geofence procedure without obtaining a warrant in many situations. *Ante*, at 22–23, n. 10. Contrary to the majority's suggestion, however, that fact does not mean that geofence procedures would lack any limits. Under *Carpenter*, if the police request and obtain sensitive, involuntarily collected location information that spans a week or more, they would still require a warrant.

ALITO, J., dissenting

beeper monitored his travel from a public place to his private residence). Moreover, if the geofence procedure uncovered information about Chatrie's movements within a private location, the proper solution would be to suppress that information, rather than the fruits of the entire procedure. See *United States* v. *Karo*, 468 U. S. 705, 720–721 (1984) (holding that location information from one leg of a defendant's journey in private places was the fruit of an unconstitutional search but upholding the use of location information from a different leg of that journey in nonprivate places).

Third, unlike the generation of cell-site records, the creation of Location History data is voluntary and not integral to a cell phone's functionality. Cell-site records are the byproduct of every phone interaction with a cell tower and thus an unavoidable consequence of sending text messages, making phone calls, or connecting to the internet. *Carpenter*, 585 U. S., at 315. A person can avoid creating those records only by forgoing all use of a cell phone for these purposes, and doing so would render useless this "indispensable" component of modern life. *Ibid.* In contrast, users need not enable Location History for their phones to function as expected. That most Google accountholders carry on without using Location History is strong evidence that the service is not a "pervasive and insistent part of daily life" in the way that creating cell-site records is. *Ibid.* (internal quotation marks omitted); see *ante*, at 26.

Thus, on the criteria that *Carpenter* found relevant in determining whether to apply the third-party doctrine, Chatrie has a far lesser privacy interest in the data that the police sought here. For that reason, I would not extend *Carpenter* here, and I would hold that the police did not need a warrant.

18                    CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

3

The majority reaches the opposite outcome, and in doing so, it announces a new rule of Fourth Amendment law: The police must obtain a warrant every time they access *any* cell-phone location information from a third party, however brief the duration, however innocuous the request, and however voluntarily that information was disclosed by the user. *Ante*, at 29. This rule significantly extends *Carpenter* and repudiates the boundary lines that *Carpenter* drew to distinguish its novel holding from longstanding doctrine. Whereas *Carpenter* rested its holding on the difference between obtaining a "brief stretch" of location information and receiving a chronicle spanning a week or more, 585 U. S., at 310, 315, the majority holds that the police need a warrant regardless of the duration of the data sought, *ante*, at 18–23. Whereas *Carpenter* rested its holding on the concern that an all-encompassing dataset would reveal a defendant's presence in sensitive locations, 585 U. S., at 311, the majority holds that the police need a warrant regardless of whether a geofence captures any sensitive locations, *ante*, at 22–24. Whereas *Carpenter* rested its holding on the near-universal use of cellphones and the unavoidability of generating cell-site records, 585 U. S., at 315, the majority holds that the police need a warrant regardless of how widespread a technology is or how feasibly users may opt out, *ante*, at 26–29. Now, we are told, all that matters is whether a given investigative procedure enables the police to obtain location information easily using a technology that did not exist in "an earlier age." *Ante*, at 16–18. If so, the police need a warrant.

This unshackling of *Carpenter* will unleash the very upheaval in Fourth Amendment law that *Carpenter* disclaimed. See 585 U. S., at 319 (stating that its holding would apply "only . . . in the rare case"). Today's decision makes clear that the last two centuries of Fourth Amendment search doctrine simply do not apply to digital-age

ALITO, J., dissenting

methods of tracking a suspect's location. And although the Court frames its holding as concerning only "location information," *ante*, at 29, that qualification "might as well be written on the dissolving paper sold in magic shops," *Fulton* v. *Philadelphia*, 593 U. S. 522, 551 (2021) (ALITO, J., concurring in judgment). If past is prologue, the parchment limits on today's holding will fade away just as quickly as *Carpenter*'s have.

4

In support of its sweeping conclusion, the majority argues that a duration-based or procedure-by-procedure approach to the Fourth Amendment would generate a "host of line-drawing questions." *Ante*, at 21, n. 9; see also *ante*, at 27–28. I do not disagree, but those questions are the inevitable byproduct of the lines that *Carpenter* drew when it distinguished away longstanding doctrine. See 585 U. S., at 322, 339 (Kennedy, J., dissenting) (explaining that *Carpenter* drew an "unprincipled and unworkable line" and imposed an "arbitrary 6-day cutoff"). Indeed, the majority's rejection of such line-drawing only betrays its expansion of *Carpenter*'s holding.

In any event, the majority's approach creates its own share of line-drawing problems. What dividing line can explain why a defendant has a reasonable expectation of privacy in his cell-phone location information but not in his bank records? See *Miller*, 425 U. S., at 442–443. Debit and credit cards might be viewed as comparably "indispensable to participation in modern society," and their use creates a detailed paper trail. *Carpenter*, 585 U. S., at 315. As a result, modern bank records contain similarly comprehensive accounts of Americans' private lives, including "the political and religious organizations to which they donate; whether they have visited a psychiatrist, plastic surgeon, abortion clinic, or AIDS treatment center; [and] whether they go to gay bars or straight ones." *Id.*, at 337 (Kennedy, J.,

20          CHATRIE *v.* UNITED STATES

ALITO, J., dissenting

dissenting).  But as long as *Miller* remains good law, see *Carpenter*, 585 U. S., at 316 (majority opinion), the Fourth Amendment does not require the police to obtain a warrant for these records.[7]

More broadly, where does the boundary between *Carpenter* and the third-party doctrine lie after today?  *Carpenter* gave "courts and law enforcement officers no indication how to determine whether any particular category of information falls" on the *Carpenter* or *Miller* side of the line, and today's decision does no better.  *Carpenter*, 585 U. S., at 340 (Kennedy, J., dissenting).  Do the police need a warrant to obtain a person's Amazon purchase history?  What about a person's Google search history or Venmo transaction log?  Those kinds of information fall squarely within the third-party doctrine, and today's holding about "cell phone location information" does not ostensibly disturb that fact.  *Ante*, at 29 (internal quotation marks omitted).  At the same time, those data can paint a similarly detailed picture of a person's private life, and law enforcement had no easy way to obtain this information in "an earlier age."[8]  *Ante*, at 17.  If the Court maintains its unwillingness to engage with such "line-drawing questions," *ante*, at 21, n. 9, *Carpenter*'s warrant requirement might soon come for all forms of digital surveillance.

\*     \*     \*

In *Carpenter*, I worried that we might be "picking up the pieces" of our Fourth Amendment doctrine for a long time to come.  585 U. S., at 362 (dissenting opinion).  Today's

---

[7] One is left wondering on which side of the line location data from a mobile-payment service like Apple Pay falls.

[8] Moreover, it is common these days for a single company, such as Google, to offer cellular plans, provide location services, maintain payment systems, host shopping platforms, and more.  Companies have incentives to aggregate a user's data across these services, and this tendency will further complicate any efforts to draw Fourth Amendment lines among different sorts of third-party records.

Cite as:  609 U. S. ____ (2026)                    21

Alito, J., dissenting

decision all but guarantees that we will be cleaning up debris for the foreseeable future.

Cite as:  609 U. S. \_\_\_\_ (2026)          1

BARRETT, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 25–112

———————

## OKELLO T. CHATRIE, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2026]

JUSTICE BARRETT, dissenting.

I have no quarrel with *Carpenter* v. *United States*, 585
U. S. 296 (2018), or with the Court's decision to grant certi-
orari in this case.  But I agree with JUSTICE ALITO that un-
der our Fourth Amendment precedent, including *Carpen-
ter*, Chatrie had no reasonable expectation of privacy in
data about his public movements that he voluntarily dis-
closed to Google.  I therefore respectfully dissent.